CHERYL A. MESSAMORE, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (State Farm Insurance Company, Appellee).

Fourth District   No. 4—97—1080WC

Argued September 15, 1998.—Opinion filed January 22, 1999.

352

Roger D. Lapan (argued), of Bloomington, for appellant.

Karen L. Kendall, Brad A. Elward (argued), Bradford B. Ingram, and Craig S. Young, all of Heyl, Royster, Voelker & Allen, of Peoria, for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Claimant Cheryl Messamore appeals the decision of the circuit court of McLean County confirming a decision of the Industrial Commission (Commission). Respondent employer is State Farm Insurance Company (State Farm). Messamore brought a workers' compensation petition based on carpal tunnel syndrome and cubital tunnel syndrome injuries, allegedly due to her work at State Farm. The arbitrator awarded Messamore 50⁴/₇ weeks in temporary total disability (TTD) benefits for her carpal tunnel syndrome for the periods of July 10, 1992, through August 18, 1992, and September 17, 1992, through July 27, 1993. The arbitrator awarded Messamore $85 in unpaid medical expenses attributable to the carpal tunnel syndrome, and $207.48 for 38 weeks in permanent partial disability (PPD) benefits, compensating for 20% loss of use of her right hand. The arbitrator denied Messamore's claim that she suffered from cubital tunnel syndrome caused by her work at State Farm.

The Commission modified the arbitrator's decision, awarding TTD benefits to January 29, 1993, 24⁶/₇ weeks. The circuit court confirmed the Commission and ordered that the overpayment of TTD benefits due to the modification be credited against Messamore's PPD award. We affirm.

Messamore is a right-handed female born in 1959. She started working for State Farm in 1980 doing data entry and secretarial work. On March 9, 1992, while at work, Messamore felt severe pain in both hands. On March 26, 1992, Dr. Herman Dick performed an electromyographic/nerve conduction velocity (EMG/NCV) test, which found no indication of right carpal tunnel syndrome or cubital tunnel syndrome. On June 19, 1992, Dr. Edward Trudeau administered an EMG/NCV test to Messamore, which indicated she suffered from mild carpal tunnel syndrome in her right wrist. There was no indication of cubital tunnel syndrome. Messamore was referred to Dr. Lawrence Nord, an orthopedic surgeon. On July 10, 1992, Nord performed a median nerve release (decompression) on her right hand.

Nord released Messamore to return to work on August 18, 1992. Upon conferring with Messamore, Nord agreed she could return to work without restrictions, provided she contacted a doctor if pain returned. According to a September 11, 1992, report by her occupational therapist, Messamore experienced increased pain, swelling, and inflammation in her hand after returning to work. On September

17, 1992, Messamore talked to Dr. Grant Zehr, the State Farm medical director, who told her not to work because it could cause further injury.

Zehr referred Messamore to Dr. Won Heum Jhee, a physiatrist. A September 24, 1992, preliminary report by Jhee indicated Messamore had carpal tunnel syndrome in both her right and left extremities. Jhee recommended Messamore not return to regular work until a "hardening" program was completed. Messamore started the program, but had difficulty with it and continued to have the same symptoms, especially pain and discomfort in the right elbow. An EMG performed on December 17, 1992, showed no indication of cubital tunnel syndrome. According to the progress notes of Messamore's work-hardening program, it was terminated because of nonattendance and a lack of significant improvement in her right wrist. The work-hardening occupational therapist described a "plateau in grip strength and range of motion in [the] right wrist."

On January 27, 1993, Jhee released Messamore to return to work with restrictions. According to Messamore, when she arrived for work on February 4, 1993, Zehr told her he would recommend to personnel she be allowed to return to work with the above restrictions, but her department did not want her back until she could work without restrictions. At Zehr's request, Messamore went to Carle Clinic on February 22, 1993, and was examined by Dr. Robert Martin on March 5, 1993. Both Martin and the clinic agreed Messamore could return to work under Jhee's restrictions.

On March 16, 1993, Messamore had a discussion with Steve Sosa, who worked with the State Farm personnel department. According to Messamore, Sosa told her she could no longer work for State Farm. Sosa told Messamore that, even though she had a release from her physician to return to work, State Farm would only allow her to return part-time due to her medical evaluation, and it had no part-time work available for her.

On January 26, 1994, Messamore received another evaluation by Trudeau. It found Messamore suffered from mild cubital tunnel syndrome in the right elbow and slight cubital tunnel syndrome in the left elbow. On March 4, 1994, Nord performed surgery on Messamore's right elbow to relieve cubital tunnel syndrome pain there.

Messamore received TTD benefits from State Farm until about June 17, 1994, and did not work anywhere else. Since June 1994, Messamore has applied for several jobs, mostly secretarial in nature, but she has received no offers of employment. Most of the positions she applied for were secretarial in nature.

At State Farm's request, Messamore saw Dr. Steven Potaczek on or around June 18, 1994. Potaczek speculates Messamore might have

developed cubital tunnel syndrome or an elbow injury because of her pregnancy while she was off work or by lifting her children at home. He concluded Messamore had a minimal case of carpal tunnel syndrome at best. He noted Messamore's complaints were grossly inconsistent with his observations. She moved her arms readily and was able to support her body weight on her arms momentarily. Potaczek found nothing to suggest carpal tunnel syndrome on the left side and no residual effect after the July 10, 1992, surgery or loss of function due to carpal tunnel syndrome on the right ride.

The fact Messamore developed carpal tunnel syndrome in her right hand but not her left indicated to Potaczek that it was not due to her work at State Farm. Potaczek concluded that the EMG reports of June 19, 1992, through January 26, 1994, indicate she did not have cubital tunnel syndrome due to her activity at work. There was a six-month period in which there was no indication of cubital tunnel syndrome and a long hiatus before she developed indications of it. Potaczek concluded the EMG indicator of cubital tunnel syndrome was mild and did not warrant surgery.

In a letter submitted into evidence, Nord stated Messamore's right wrist pain was due to carpal tunnel syndrome as a result of her employment with State Farm. Nord further stated Messamore's right elbow pain was due to cubital tunnel syndrome, which was causally related to her work.

Messamore submitted a list of unpaid medical expenses totalling $7,534.97. The parties stipulated State Farm had paid Messamore $23,711.66 in TTD benefits at the rate of $230.53 per week. These payments covered the time off from the first surgery on July 10, 1992, up to Potaczek's exam on or around June 18, 1994.

On December 1, 1995, the arbitrator found Messamore's cubital tunnel syndrome was not related to her employment and denied all claims for medical treatment associated with this condition. The arbitrator relied upon the June 19, 1992, EMG, the delay after Messamore left work and before symptoms of cubital tunnel syndrome arose, and Potaczek's opinion. The arbitrator awarded Messamore TTD in the amount of $230.51 per week for 50⁴/₇ weeks, $85 for money owed Jhee for medical expenses and $207.48 per week for 38 weeks, for 20% PPD to the right hand. The arbitrator relied on the fact the carpal tunnel syndrome had been surgically repaired.

The parties dispute whether Messamore's TTD award should be cut off as of the date Jhee stated she could return to work, because, according to Messamore, State Farm refused to allow her to work under the conditions described by Jhee. When entering the TTD award, the arbitrator noted that after Messamore returned to work briefly in the fall of 1992:

> "Petitioner began experiencing further difficulties and left work again on September 17, 1992[,] and underwent conservative medical treatment *until released to restricted duty by Dr. Jhee on January 27, 1993. Respondent had no work for Petitioner at that time, but she had reached maximum medical improvement.*
>
> *Based upon the above,* petitioner is found to be temporarily and totally disabled from work commencing July 10, 1992[,] through August 18, 1992[,] and again from September 17, 1992[,] *through July 27, 1993*[,] for a total of 50-4/7 weeks and is entitled to receive benefits for the same." (Emphasis added.)

Apparently, the arbitrator intended to cut off benefits as of January 27, 1993, when Jhee wrote the letter releasing Messamore for work. However, apparently due to a clerical error, the July 27, 1993, date was used instead.

On April 15, 1997, the Commission affirmed the arbitrator's decision, except it reduced the period for TTD benefits by changing the cutoff date from July 27, 1993, to January 29, 1993, for a new total of 24-6/7 weeks. The Commission relied upon Jhee's "return to work" slip, dated January 27, 1993, stating Messamore could return to work with restrictions as of January 23, 1993. The Commission further found respondent "shall have credit for all amounts paid to or on account" of her injury. On October 31, 1997, the circuit court confirmed the Commission's decision. The circuit court held any overpayments of TTD benefits to Messamore could be credited against the permanent award.

■ Messamore first argues the Commission's decision was not supported by the evidence. The Commission exercises original rather than appellate jurisdiction, and it is not bound by the arbitrator's findings. *Wirth v. Industrial Comm'n,* 63 Ill. 2d 237, 241, 347 N.E.2d 136, 138 (1976). Here the Commission decided to adopt the arbitrator's recommendations, except with respect to the period of TTD benefits. The Commission's action will not be disturbed on judicial review unless it is against the manifest weight of the evidence. *Cooper v. Industrial Comm'n,* 33 Ill. 2d 477, 479, 211 N.E.2d 717, 719 (1965).

■ Messamore argues the Commission erred by cutting off TTD benefits as of January 29, 1993, despite the fact she was not allowed to return to work as of that date. The fact a claimant is capable of working with restrictions or limitations does not bar him from seeking TTD if no positions fitting those limitations are available. See *Zenith Co. v. Industrial Comm'n,* 91 Ill. 2d 278, 286-87, 437 N.E.2d 628, 632-33 (1982); *Whitney Productions, Inc. v. Industrial Comm'n,* 274 Ill. App. 3d 28, 30-31, 653 N.E.2d 965, 967-68 (1995).

■ The arbitrator found that the effects of Messamore's carpal

tunnel syndrome had stabilized by January 27, 1993, and "she had reached maximum medical improvement." TTD benefits are to be awarded for the period between the date of the injury and the date when the employee's condition has stabilized so far as the permanent character of the injury will permit. *McKay Plating Co. v. Industrial Comm'n*, 91 Ill. 2d 198, 209, 437 N.E.2d 617, 622 (1982). According to the progress notes from Jhee and the occupational therapist, Messamore's hand had improved as much as it was likely to. The Commission could reasonably conclude that, if Messamore was still disabled from carpal tunnel syndrome, the disability was permanent.

As to claimant's cubital tunnel syndrome, the arbitrator found the evidence did not support a finding that it was work-related. The arbitrator found that the EMG performed June 19, 1992, and "the significant delay in treatment as well as the opinions of Dr. Potaczek support this finding." No sign of cubital tunnel syndrome appeared until January 1996, long after Messamore had stopped working for State Farm, and there had been three EMGs in the interim showing no signs of cubital tunnel syndrome.

The remaining issue on appeal is whether the circuit court could credit overpayment of TTD benefits against Messamore's PPD award. The trial court held that it could. There is no binding Illinois precedent directly on point. Two older decisions of the Illinois Court of Claims held this type of credit is proper. See *Harper v. State*, 12 Ill. Ct. Cl. 209 (1942); *Veselsky v. State*, 12 Ct. Cl. 181, 185 (1942).

The parties rely on two cases that differ on the issue of whether an overpayment of benefits may be credited against a later award. Compare *World Color Press v. Industrial Comm'n*, 125 Ill. App. 3d 469, 471-72, 466 N.E.2d 270, 272 (1984) (overpayment of TTD benefits may be set off against the "total award"), and *Bettis v. Oscar Mayer Foods Corp.*, 242 Ill. App. 3d 689, 691, 610 N.E.2d 1354, 1355-56 (1993) (overpayment of benefits may not be set off against non-TTD benefits).

Both cases involved credits provided under section 8(j) of the Workers' Compensation Act (Act) (see 820 ILCS 305/8(j) (West 1996)). Section 8(j)(1) is not the basis for the credit sought by State Farm. The record in this case shows nothing to indicate Messamore participated in a group plan to which State Farm made contributions and, according to a letter sent from State Farm to Messamore and submitted into evidence by Messamore, Messamore had opted not to participate in one.

However, we still look to *Bettis* and *World Color Press*, to the extent they are relevant, for guidance on the issue now before us. *Bettis* rejected the idea of credit against a PPD award because the plain language of section 8(j)(1) only allows credit "to or against" TTD

benefits. *Bettis*, 242 Ill. App. 3d at 691, 610 N.E.2d at 1355. While the *Bettis* decision does not clearly state the type of benefits being offset against the PPD award, its interpretation of section 8(j)(1) would apply to any type of credits against a non-TTD award under a group plan.

Immediately following its discussion of the language of section 8(j)(1), *Bettis* made the statement relied upon by Messamore that, *"[i]n other words*, the *** credit could not, as a matter of law, be deducted from the [PPD] award." (Emphasis added.) *Bettis*, 242 Ill. App. 3d at 691, 610 N.E.2d at 1355. This statement was simply a summary of its analysis of section 8(j)(1) and has no broader significance. Because no group plan is at issue here, neither section 8(j)(1) nor the reasoning in *Bettis* is applicable.

■ Section 8(j)(2) provides:

> *"Nothing contained in this Act* shall be construed to give the employer or the insurance carrier the right to credit for any benefits or payments received by the employee other than compensation payments provided by this Act, and where the employee receives payments other than compensation payments, *** the employer or insurance carrier shall receive credit for each payment only to the extent of the compensation that would have been payable during the period covered by such payment." (Emphasis added.) 820 ILCS 305/8(j)(2) (West 1996).

As the emphasized language demonstrates, this provision is not limited to benefits under group plans. *World Color Press* relied, in part, on this section in concluding the measure of allowable credits is the compensation benefits the employee should receive. See *World Color Press*, 125 Ill. App. 3d at 471-72, 466 N.E.2d at 272.

■ *World Color Press* also engaged in a broad analysis of the policies underlying the Act, stating:

> "The argument is made that it is unfair to recoup overpayments which an employee may have used to replace income while he or she has been unable to work. Further, that requiring repayment would cause an injured employee to be hesitant to spend benefits received during the temporary period out of fear that the employer would require repayment of the overpayment in the future. However, interpreting the statute so as to hold the employer to administrative exactness in its payment prior to adjudication, and denying it the right to recoup any excess payment it may later discover, could frustrate a primary purpose of the Act, to provide prompt payment to the employee." *World Color Press*, 125 Ill. App. 3d at 472, 466 N.E.2d at 272.

*World Color Press* does not explicitly state the overpayment of TTD benefits is being set off against a permanent award, but instead speaks

only in vague terms of credit against "future compensation payments" and the "total award." However, we apply the reasoning of *World Color Press* regardless of whether the credit is sought against a permanent disability award or some other benefit paid after the TTD overpayment.

■ We allow State Farm credit against the permanent award for TTD overpayments. The employee should not receive a windfall at the employer's expense due to an accidental overpayment of TTD benefits. In drafting the Act, the legislature was careful to protect injured workers and to encourage employers to make prompt payments before the amount of liability is certain. Denying credits for errors such as the one in this case would encourage administrative delays as employers attempt to resolve every ambiguity before paying benefits.

Messamore relies upon *Western Cartridge Co. v. Industrial Comm'n*, 357 Ill. 29, 33, 191 N.E. 213, 214-15 (1934), and *Briggs Manufacturing Co. v. Industrial Comm'n*, 212 Ill. App. 3d 318, 321, 570 N.E.2d 1152, 1153-54 (1989), which state that TTD benefits are not deductible from an allowance for permanent disability. However, neither case stands for a rigid rule that would prevent credits for overpayments. When determining the duration of each type of allowance, these decisions rely on the fact TTD benefits are not automatically credited against permanent disability payments.

Finally, Messamore argues credit for TTD overpayments is forbidden by the supreme court's decision in *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 639 N.E.2d 1282 (1994). *Illinois Graphics* held an employer may not bring a claim for such credits under section 19(g) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.19(g)). However, *Illinois Graphics* relied on the language of section 19(g), which is not at issue here. In fact, the opinion specifically distinguishes *World Color Press*, noting the employer in *World Color Press*, like State Farm in this case, was seeking credit against future payments, not bringing a separate claim for overpayments under section 19(g). See *Illinois Graphics*, 159 Ill. 2d at 480, 639 N.E.2d at 1287.

For all of the above reasons, we affirm.

Affirmed.

RAKOWSKI, COLWELL, HOLDRIDGE, and RARICK, JJ., concur.