MARIANNE SMITH, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*
(Burns Security, Appellee.)

Third District    No. 3—98—0827WC

Opinion filed October 13, 1999.—Rehearing denied November 18, 1999.

RAKOWSKI, J., specially concurring.

Terence B. Kelly, of Law Offices of Peter F. Ferracuti, P.C., of Ottawa, for appellant.

John McAndrews and Michael G. Patrizio, both of Dowd & Dowd, Ltd., of Chicago, for appellee.

JUSTICE HOLDRIDGE delivered the opinion of the court:

Claimant, Marianne Smith, filed a claim pursuant to the Illinois Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.*) (West 1996)) seeking compensation for a right shoulder injury that she sustained on March 26, 1992, while employed by Burns Security (the employer).

The arbitrator found that claimant sustained accidental injuries, which arose out of and within the course of her employment, and which were causally connected to her March 26, 1992, accident. The arbitrator awarded claimant temporary total disability (TTD) benefits, a wage differential (WD), medical expenses, and penalties.

The Illinois Industrial Commission (the Commission) affirmed in part and vacated in part the arbitrator's TTD benefit award, vacated the WD and penalties award, awarded claimant permanent partial disability (PPD) benefits, and otherwise affirmed and adopted the arbitrator's decision.

The circuit court of La Salle County reversed the Commission's decision concerning the disputed TTD period, reinstated the arbitrator's TTD benefit award for that period, and confirmed the Commission's PPD benefit award.

Claimant worked as a security supervisory officer for the employer. This position required her to pass an annual physical agility and weaponry test. As of March 1992, her hourly rate of pay was $14.70.

On March 26, 1992, and in an attempt to break an airlock seal at the employer's Unit One reactor, claimant injured her right shoulder. On March 27, 1992, and upon the employer's referral, she was seen by Dr. Ralph Tack, who took X rays, prescribed medication, and ordered physical therapy, which she underwent through November 1992. Dr. Tack referred her to orthopedic surgeon Dr. Keith Rezin, who, after taking a history and an exam, opined that "evidently she injured her right shoulder at work on March 26, 1992," and he diagnosed her with a rotator cuff tear. He prescribed shoulder injections and an arthrogram.

On July 23, 1992, claimant underwent an acromioplasty and a rotator cuff repair performed by Dr. Rezin. In October 1992, Dr. Rezin noted that claimant "really has a restricted range of motion." On November 6, 1992, Dr. Rezin noted claimant was "lacking some external rotation and still having some weakness, prescribing another couple of weeks of therapy." He released her to return to work on November 6, 1992. However, due to the employer's delay, she was told to report to work on November 30, 1992. When she reported to work the employer told her that she was laid off and that her TTD benefit payments were terminated.

In February 1993, claimant was examined by Dr. Gerald McDonald, who found a protruding mass in the superior aspect of her right shoulder, in addition to deformity, tenderness, and limited range of motion.

Claimant continued to treat with Dr. Rezin. He made a postsurgical diagnosis of impingement syndrome of the right shoulder. His April and May 1993 notes indicated her ongoing pain and range-of-motion limitations.

In June 1993, the employer referred claimant to orthopedic surgeon Dr. Daniel Mass, who diagnosed her with a partial rotator cuff tear and subacromial inflammation. In July 1993, after Dr. Mass indicated that claimant continued to be disabled from employment,

the employer reinstated her TTD benefits. In October 1993, due to her continued pain and functional loss, Dr. Mass performed a second acromioplasty and a distal clavicle resection. Thereafter, Dr. Mass prescribed physical therapy and medication, which continued through September 1994.

In 1994, the employer revised its employee classifications and its minimum standards for firearms and agility testing. In March 1994, Dr. McDonald again examined claimant, and his findings were consistent with his earlier exam. He opined that there was a causal relationship between claimant's March 1992 accident and her subsequent symptoms and treatment, as well as her physical abnormalities. He believed that her condition was now permanent and that she would never be able to perform her prior duties as a security supervisory officer.

On September 29, 1994, Dr. Mass released claimant to return to work as of October 3, 1994, which was conditioned upon her recertification in weaponry and agility testing. He noted that "[i]f she cannot pass the re-certification exam, then she will have to be retrained for another job."

On October 3, 1994, claimant reported to work but was told that she was still laid off. The employer did not seek recertification of claimant but, instead, continued her TTD benefits until January 6, 1995, at which time it suspended those benefits "until Dr. Mass issued a restriction letter."

In spring 1995, claimant enrolled in a computer class and consulted with a vocational rehabilitative service, which, after testing, suggested a vocational change. Claimant filed a section 19(b) motion for continued benefits. Thereafter, the employer referred her to Dr. Mitchell Krieger.

In March 1995, Dr. Krieger issued a report that diagnosed claimant with status post-operative acromioplasty, rotator cuff repair, and distal clavicle resection. He advised a functional work capacity evaluation to determine if claimant could fire a shotgun as required in her employment as a security supervisory officer.

On June 7, 1995, claimant was recalled to work, and she was tested to see if she was qualified to resume her supervisory duties. On June 13, 1995, and at the request of the employer, claimant was examined by Dr. Carmelo Ruiz, who noted "significant decreased range of motion of the shoulder and decreased strength of the arm, forearm, wrist and grip *** [which] may have negative impact on agility/firearms test."

On June 25, 1995, due to her shoulder condition, claimant failed her first attempt at requalification. The employer provided her with a

shoulder strap and a second test; however, she failed her second attempt. Thereafter, claimant was seen by her personal physician, Dr. Michael Harney, who prescribed medication and saw her on four occasions. Dr. Mass also prescribed more physical therapy.

Also on June 25, 1995, claimant requested that she be retrained to another vocation. The employer told her that she was not eligible for retraining. The employer offered, and claimant accepted, a position as a senior watch person. She was not required to carry a weapon and had less strenuous duties than a supervisor. She accepted an $8.55 hourly rate of pay, which was increased to $9.75 because of her seniority. Due to several pay raises during March 1996, by the end of that month claimant earned $15 per hour.

Claimant received her last treatment for her right shoulder on August 10, 1995. In December 1995, a functional capacity evaluation showed claimant's "work tolerance at a light-medium physical demand level." Her ability to tolerate the shooting of a shotgun placed against her right shoulder went beyond the scope of this test.

The arbitrator found claimant sustained accidental injuries that arose out of and within the course of her employment and that were causally connected to her March 26, 1992, accident.

The arbitrator awarded claimant TTD benefits in the amount of $337.12 per week for 171 6/7 weeks, $1,094 in penalties, and a WD in the amount of $145.99 per week beginning July 14, 1995, and continuing through the duration of her disability. The arbitrator concluded that "[i]t is apparent *** that the action of the Respondent in artificially raising Petitioner's wage *** from $9.75 to $15.00 per hour was a sham and transparent device to avoid the effect of a [section] 8(d) 1 finding. To permit an employer indulging in such conduct would wrongfully deprive an injured employee of [a section] 8(d) 1 remedy ***."

The Commission vacated the arbitrator's TTD award for the period of November 30, 1992, through June 21, 1993, only; vacated the WD and penalties award; determined that claimant was permanently partially disabled to the extent of 30% loss of the use of a man as a whole and awarded her $145.99 per week for 150 weeks in PPD benefits; and otherwise affirmed and adopted the arbitrator's decision.

The circuit court reversed the Commission as to the disputed TTD benefit period and reinstated the arbitrator's award of TTD benefits for the period of November 30, 1992, through June 21, 1993. It confirmed, however, the Commission's PPD benefit award in lieu of the arbitrator's WD award.

The sole issue on appeal concerns whether the Commission erred in awarding PPD benefits under section 8(d)(2) in lieu of affirming the arbitrator's WD award under section 8(d)(1).

■ Section 8(d)(2) provides in pertinent part that if a claimant suffers injuries that partially incapacitate him from pursuing the usual and customary duties of his line of employment, but do not cause him to suffer an impairment of earning capacity, in addition to TTD benefits, he shall receive compensation for that percent of 500 weeks that his partial disability bears to his total disability.

On the other hand, if a claimant suffers an impairment of earnings, section 8(d)(1) provides, in pertinent part:

> "If, after the accidental injury has been sustained, the employee as a result thereof becomes partially incapacitated from pursuing his usual and customary line of employment, he shall *** receive compensation for the duration of his disability, subject to the limitations as to maximum amounts fixed in paragraph (b) of this Section, equal to 66²/₃% of the difference between the average amount which he would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of the accident and the average amount which he is earning or is able to earn in some suitable employment or business after the accident." 820 ILCS 305/8(d)(1) (West 1992).

■ In order to qualify for a wage differential award pursuant to section 8(d)(1), claimant must prove: (1) partial incapacity which prevents pursuit of his "usual and customary line of employment"; and (2) an impairment of earnings. See *Albrecht v. Industrial Comm'n*, 271 Ill. App. 3d 756, 759 (1995).

In *Albrecht*, the court concluded that the claimant, a professional football player, satisfied the above-mentioned elements of proof by establishing that: (1) but for his injuries, he would have been in full performance of his duties as a Bears offensive lineman; and (2) his annual earnings following his injury were considerably less than the salary for his final season as a professional football player, thereby proving an impairment of earnings. The *Albrecht* court held, therefore, that a WD award should have been entered in claimant's favor as a matter of law.

In the instant case, medical evidence established that claimant was no longer able to work in her former occupation as a security supervisory officer due to the fact that her right shoulder injury, suffered as a result of her March 1992 accident, prevented her from obtaining the required recertification in weaponry and agility testing. Therefore, claimant proved that her partial incapacity prevented her from pursuing her usual and customary line of security supervisory officer employment.

Whether claimant proved an impairment of earnings must next be determined in order to justify a WD award. The object of section

8(d)(1) is to compensate an injured claimant for his reduced earning capacity, and if an injury does not reduce his earning capacity, he is not entitled to compensation. *Rutledge v. Industrial Comm'n*, 242 Ill. App. 3d 329 (1993).

A claimant must prove his actual earnings for a substantial period before his accident and after he returns to work, or in the event he is unable to return to work, he must prove what he is able to earn in some suitable employment. *Franklin County Coal Corp. v. Industrial Comm'n*, 398 Ill. 528, 531 (1947).

■ In the instant case, in the year preceding her March 26, 1992, accident, claimant's rate of pay as a security supervisory officer was $14.70 per hour. When claimant returned to work as a senior watch person, a job that met her restrictions, she earned $8.55 per hour, which was thereafter increased to $9.75 per hour due to her seniority.

By March 1, 1996, claimant's pay rate increased to $13.73 per hour, then to $14.75 per hour by March 8, and finally to $15 per hour by March 29. Claimant was not informed of, or given any reason for, these pay raises, and her duties were not modified from those of other senior watch persons who continued to be paid $9.75 per hour. Claimant's site security manager acknowledged that he might have been involved in conversations wherein claimant's workers' compensation supervisor told him to raise her wages due to the pending workers' compensation case.

The arbitrator determined that the employer raised claimant's wages in an attempt to avoid the effect of a WD award, and, therefore, her actual wage rate as a senior watch person, and her actual earning capacity in light of her restrictions, was $9.75 per hour. The arbitrator noted that if claimant had successfully obtained her recertification in weaponry and physical agility, she would have accepted an available security supervisory officer position that paid $15.23 per hour. As a result, the arbitrator awarded claimant a WD between a security supervisory officer position and a senior watch person position.

The Commission found that the record regarding claimant's current earnings did not support a WD award. The Commission noted that claimant received three pay raises within one month in an apparent attempt by the employer to reduce a WD award; however, it found that a permanency award under section 8(d)(2) was more appropriate on the present record.

The circuit court affirmed the Commission's WD award, as it found that claimant was earning the same amount as she had earned in her previous job, and, therefore, she suffered no loss of earning capacity to justify such an award.

Our supreme court in *General Electric Co. v. Industrial Comm'n*,

89 Ill. 2d 432, 437-38 (1982) acknowledged that there is a preference for WD awards, as opposed to scheduled awards. However, the court recognized such preference in those situations where the claimant proved that his actual loss of earnings was greater than the schedule presumed.

Claimant submits that the instant case is one of interpreting statutory construction and, therefore, this court is not bound to the Commission's decision on such a question of law. *Butler Manufacturing Co. v. Industrial Comm'n*, 85 Ill. 2d 213 (1981).

Specifically, claimant focuses on the term "is earning or is able to earn" and asserts that the $15 per hour that she was being paid at the time of hearing was not what she was earning or was able to earn. Claimant refers to the definition of "earn" found in Black's Law Dictionary, which states "[t]o acquire by labor, service or performance. [Citation.] To merit or deserve." Black's Law Dictionary 456 (5th ed. 1979). Claimant submits that wages that are artificially raised, as the employer did here, above what is normally paid for such services, are not "earned" based on her "labor, service or performance." We agree.

Further, claimant notes that the definition of "earning capacity" states, *inter alia*, that the "[t]erm does not necessarily mean the actual earnings that one who suffers an injury was making at the time the injuries were sustained, but refers to that which, by virtue of the training, the experience, and the business acumen possessed, an individual is capable of earning." Black's Law Dictionary 456 (5th ed. 1979).

Claimant submits that her actual earning capacity based on her functional impairment was that of a senior watch person, and therefore, this fact further established that her actual rate of pay was $9.75 per hour. We agree.

On review, the Commission's compensation award should be reversed only if it was contrary to the manifest weight of the evidence, *i.e.*, where the opposite conclusion is clearly apparent. *Durfee v. Industrial Comm'n*, 195 Ill. App. 3d 886, 890 (1990). Here, although at the time of hearing claimant was being paid at the rate of her previous position as a security supervisory officer, we cannot ignore the fact that the arbitrator, the Commission, and the circuit court all recognized that the employer raised claimant's wages in an attempt to avoid a WD award. This fact, in and of itself, supports a finding that claimant's actual earning capacity was $9.75 per hour. We believe, therefore, that claimant proved impaired earning capacity, and as a result, the Commission's decision not to affirm the arbitrator's WD award was against the manifest weight of the evidence.

Based upon the foregoing, the decision of the circuit court of

La Salle County, which confirmed the Commission's PPD benefit award, is reversed and the arbitrator's WD award is reinstated.

Reversed.

McCULLOUGH, P.J., and COLWELL and RARICK, JJ., concur.

JUSTICE RAKOWSKI, specially concurring:

I agree with the majority that claimant is entitled to an award pursuant to section 8(d)(1). I write separately because I would remand this cause to the Commission to consider the arbitrator's section 8(d)(1) award.

This is not a case where the arbitrator and the Commission were dealing with the same issue. Consider, for example, a situation where the arbitrator awarded 80% of the person as a whole which the Commission modified to a lessor amount. In such a situation, if we conclude that the Commission's decision was against the manifest weight of the evidence, we may reinstate the arbitrator's award. Both the arbitrator and the Commission considered the same issue, percentage of a person as a whole, with differing results.

In the instant case, the Commission vacated the arbitrator's section 8(d)(1) award and made an award pursuant to section 8(d)(2). The Commission only addressed the propriety of a section 8(d)(1) award. In that we have concluded that section 8(d)(1) is proper, the Commission should now address the amount. By reinstating the arbitrator's award, the majority has denied Commission review of the arbitrator's decision.