RICKY J. GALLIANETTI, Appellant, v. THE INDUSTRIAL COMMISSION *et al*. (Asplundh Tree Expert Company, Appellee).

Third District   No. 3—99—0741WC

Opinion filed July 28, 2000.—Rehearing denied September 12, 2000.

Terence B. Kelly, of Thomson & Weintraub, of Bloomington, for appellant.

Andrew S. De Blank and Charles D. Knell, both of Knell & Kelly, L.L.C., of Peoria, for appellee.

JUSTICE COLWELL delivered the opinion of the court:

Claimant, Ricky J. Gallianetti, appeals the decision of the circuit court of Bureau County confirming the decision of the Industrial Commission (Commission). On appeal, claimant argues that the Commission erred in awarding him permanent partial disability (PPD) benefits under section 8(d)(2) of the Workers' Compensation Act (Act) (820 ILCS 305/8(d)(2) (West 1992)) in lieu of a wage-differential award under section 8(d)(1) of the Act (820 ILCS 305/8(d)(1) (West 1992)). Alternatively, claimant contends that the Commission (1) erred in modifying the arbitrator's award of temporary total disability (TTD) benefits and (2) improperly granted respondent a credit against his PPD award. For the reasons that follow, we affirm in part, reverse in part, and remand with directions.

## I. FACTS

On July 11, 1994, claimant filed an application for adjustment of claim. Claimant alleged that he sustained injuries to his left elbow while working as a tree trimmer for respondent, Asplundh Tree Expert Company. According to the application, on July 3, 1992, claimant was hit in the left elbow with shotgun pellets while working for respondent in the Peoria area. An arbitration hearing on claimant's application was held on October 7, 1996. The record from that hearing reveals the following relevant facts.

Claimant is a resident of Tiskilwa, Illinois. Tiskilwa is located approximately 55 miles north of Peoria, 30 miles west of LaSalle-Peru/Ottawa, and 7 miles south of Princeton. Although he quit high school before completing his sophomore year, claimant eventually completed an apprenticeship with the International Brotherhood of Electrical Workers (IBEW), Local 51, in Springfield. While affiliated with Local 51, claimant held jobs as part of the spray crew and the tree-trimming crew. At the time of his injury, claimant was 41 years old and working as a tree-trimming crew foreman. Claimant's duties included climbing trees, cutting them with a chainsaw, and running a chipper. Working as a tree trimmer involved lifting equipment in excess of 40 pounds.

The day after he sustained his injuries, claimant treated at the emergency room at Perry Memorial Hospital (Perry) in Princeton. The

following day claimant returned to Perry for X rays. The X rays revealed two foreign bodies consistent with pellets. One of the pellets was lodged in soft tissue, while the other was intra-articular. Claimant was treated with intravenous antibiotics.

On July 7, 1992, claimant sought treatment with Dr. Martin Faber. Dr. Faber referred claimant to Dr. Mark Phillips, an orthopaedic specialist. On July 24, 1992, Dr. Phillips performed an arthroscopy of the left elbow with a partial synovectomy and a debridement of the elbow joint. Despite the surgery, claimant's complaints persisted, and Dr. Phillips referred claimant to Dr. Ronald Palmer.

On December 8, 1992, Dr. Palmer performed an arthrotomy of the left elbow with pellet removal. To assist claimant's recovery, Dr. Palmer prescribed physical therapy. On July 6, 1993, Dr. Palmer released claimant to work without restrictions. Although claimant returned to work, any vibration, lifting, or heavy pulling would aggravate his condition. He would also experience swelling and burning and needle-like sensations in his arm. Because of these symptoms, claimant was unable to climb trees or use a chainsaw. On July 26, 1993, Dr. Palmer diagnosed claimant with cubital tunnel syndrome and recommended surgery if his symptoms intensified. On September 1, 1993, Dr. Palmer authorized claimant to be off work and scheduled surgery. On December 28, 1993, claimant underwent an anterior transposition of the left ulnar nerve at the elbow. After the operation, claimant was placed in a work-hardening program.

Eventually, claimant returned to Dr. Faber, who referred him to Dr. Daniel Nagle. Claimant first treated with Dr. Nagle on February 10, 1994, with complaints of pain in the elbow, particularly when extended. Dr. Nagle indicated the presence of a foreign object in claimant's left elbow. Dr. Nagle also noted possible nerve compressions. Dr. Nagle eventually ordered a magnetic resonance imaging (MRI) and electrodiagnostic studies. These tests revealed a pinched ulnar nerve.

Claimant testified that in July 1994 respondent contacted him regarding a flagging job. According to claimant, although he expressed interest in the position, respondent never followed through with an offer.

On August 16, 1994, Dr. Nagle prescribed steroid shots in the elbow and ordered a functional capacity evaluation. On September 27, 1994, claimant underwent the functional capacity evaluation. On October 18, 1994, Dr. Nagle reviewed the results of the evaluation with claimant. The evaluation showed that claimant would be unable to return to his normal job duties as a tree trimmer. The evaluation indicated a sedentary-type job that would not place resistive demands

on claimant's left upper extremity and that would require only light intermittent use as an assist to the right hand. Following claimant's October 1994 appointment, Dr. Nagle discharged claimant to return on an as-needed basis.

Claimant continued to experience pain and swelling in his arm. Although claimant attempted to contact Dr. Nagle by telephone in January 1995, he never spoke with the doctor.

Claimant testified that he telephoned Local 51 approximately four times between September 1994 and September 1995 in an attempt to find work. Claimant spoke with a Dominic Rivero. Around the same time, claimant also contacted several employers in the Tiskilwa and Princeton areas. All of these efforts were fruitless.

Around October 1995, claimant began experiencing pains in his left thumb, forearm, hand, neck, and shoulder. He also noted "popping" and locking in his left elbow. On October 17, 1995, claimant visited Dr. Nagle, who prescribed pain medication and vitamin B6 and ordered additional electrodiagnostic studies. Claimant last treated with Dr. Nagle on January 9, 1996. At that time, Dr. Nagle advised claimant to continue taking his pain medication and authorized him to return on an as-needed basis.

As of the date of the arbitration hearing, claimant testified that he is unable to lift anything weighing more than four or five pounds. Claimant, who is right-hand dominant, also indicated that he is unable to use his left arm for support or to climb or grip. Claimant further testified that respondent has not offered claimant vocational rehabilitation. Following his January 1996 visit with Dr. Nagle, claimant conducted another job search. Specifically, claimant applied to several factories in the Princeton area. Claimant testified that the starting wage at the factories was $5.50 per hour. Claimant also regularly returned to the places he applied to beginning in October 1994. Most of those employers paid minimum wage. Claimant admitted that although Dr. Nagle did not place any restrictions on his driving, he limited his employment search to the area near his home because he experiences discomfort in his arm when driving more than 10 or 15 miles.

Claimant also contacted employers identified in a labor market survey prepared on respondent's behalf. The survey identified four possible types of employment for claimant: tree-trimming supervisor, exterminator, storage rental clerk, and security guard. It also listed employer contacts and vocational requirements for 21 jobs in the Peoria and Ottawa areas. Claimant stated that he contacted four exterminators and at least two security firms from the labor market survey. Claimant did not obtain a position with any of the employers.

Eventually, claimant obtained full-time employment at Steimle Garage, Inc., in Tiskilwa, earning $5.50 per hour. However, he testified that discomfort associated with his injury often prevents him from working the entire week.

Admitted into evidence was the deposition of Michael Holcomb, a business representative for IBEW, Local 51. According to Holcomb, the IBEW has about 30 classifications of employment in three principal areas: (1) tree trimming, (2) electrical work, and (3) telephone work. Among Holcomb's duties is to assign union members to contractors for job placement. Based on the restrictions listed in the functional capacity evaluation, Holcomb opined that claimant would be unable to perform duties within any of the job classifications for which he is qualified. According to Holcomb, although the union tries to place members with restrictions into positions within their limitations, he never had any direct contact with claimant regarding job placement.

Dr. Nagle testified via evidence deposition that claimant is unable to return to work as a tree trimmer. Dr. Nagle also related that, based on his decision to release claimant from his care on October 18, 1994, it was his opinion that claimant had reached maximum medical improvement on that date. Dr. Nagle later stated that claimant reached maximum medical improvement on the date that he ordered the functional capacity evaluation. Dr. Nagle also noted that when claimant visited him in October 1995, his condition as it related to the gunshot injury had remained essentially unchanged from October 1994.

Also admitted into evidence was a report authored by Dr. Gerald McDonald. Dr. McDonald examined claimant on February 3, 1996, at the request of claimant's counsel. Dr. McDonald opined that claimant's symptoms are causally connected to his gunshot injury. Dr. McDonald also opined that claimant is permanently and totally disabled from performing his duties as a tree trimmer.

The arbitrator determined that claimant's condition of ill-being was causally connected to his injury. The arbitrator concluded that claimant's condition had not reached a state of permanency until January 9, 1996, when he last treated with Dr. Nagle. In support of her decision, the arbitrator noted that in an August 16, 1994, report, Dr. Nagle estimated that claimant was not expected to improve for a period of 12 months. The arbitrator also noted that the functional capacity evaluation limited claimant to sedentary-type positions. While the arbitrator admitted that claimant did not seek medical attention between October 1994 and October 1995, she noted that, during this period, claimant was taking nonprescription pain medication and employing a variety of assistive devices in an effort to alleviate his

pain. Further, the arbitrator noted that, during that year, claimant demonstrated by his efforts that he was unable to obtain employment within his physical restrictions and that respondent failed to show that claimant was capable of performing some regular employment within his limitations.

Next, the arbitrator determined that claimant was entitled to $371.36 a week for 300 weeks because the injuries sustained caused claimant to be incapacitated to the extent of 60% loss of use of a man as a whole. See 820 ILCS 305/8(d)(2) (West 1992). Finally, the arbitrator determined that respondent was responsible for claimant's unpaid medical expenses and that no credit was due respondent for overpayment of TTD.

On appeal, the Commission modified the arbitrator's TTD award. The Commission concluded that claimant was entitled to TTD only until October 18, 1994. It was on that date that Dr. Nagle stated that claimant had reached maximum medical improvement and he released claimant from his care. Therefore, the Commission credited respondent for overpayment of TTD. In all other respects, the Commission affirmed and adopted the arbitrator's decision. On administrative review, the circuit court of Bureau County confirmed. This timely appeal followed.

## II. ANALYSIS

Claimant argues that he was entitled to a wage-differential award. According to claimant, only where an individual has not sustained a loss of earning capacity is a percentage-of-the-person-as-a-whole award appropriate. Here, claimant maintains that he demonstrated a loss of earning capacity. Therefore, claimant urges us to grant him a wage-differential award.

■ Under the Act, once a claimant proves that he or she has sustained a disability, the question of compensation arises. The Act provides for various types of compensation. Relevant to our discussion is paragraph (d) of section 8, which pertains to PPD. 820 ILCS 305/8(d) (West 1992). Section 8(d) specifies two distinct types of compensation. Subparagraph 1 of section 8(d) involves a wage-differential award. 820 ILCS 305/8(d)(1) (West 1992). Subparagraph 2 of section 8(d) involves a percentage-of-the-person-as-a-whole award. 820 ILCS 305/8(d)(2) (West 1992). In *General Electric Co. v. Industrial Comm'n*, 89 Ill. 2d 432, 438 (1982), our supreme court expressed a preference for wage-differential awards over scheduled awards.

Section 8(d)(1) provides:

"If, after the accidental injury has been sustained, the employee as a result thereof becomes partially incapacitated from pursuing

his usual and customary line of employment, he *shall*, except in cases compensated under the specific schedule set forth in paragraph (e) of this Section, receive compensation for the duration of his disability, subject to the limitations as to maximum amounts fixed in paragraph (b) of this Section, equal to 66²/₃% of the difference between the average amount which he would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of the accident and the average amount which he is earning or is able to earn in some suitable employment or business after the accident." (Emphasis added.) 820 ILCS 305/8(d)(1) (West 1992).

Section 8(d)(2) provides in pertinent part:

"If, as a result of the accident, the employee sustains serious and permanent injuries not covered by paragraphs (c) and (e) of this Section, or having sustained injuries covered by the aforesaid paragraphs (c) and (e), he shall have sustained in addition thereto other injuries which injuries do not incapacitate him from pursuing the duties of his employment but which would disable him from pursuing other suitable occupations, or which have otherwise resulted in physical impairment; or if such injuries partially incapacitate him from pursuing the duties of his usual and customary line of employment but do not result in an impairment of earning capacity, or having resulted in an impairment of earning capacity, the employee elects to waive his right to recover under the foregoing subparagraph 1 of paragraph (d) of this Section, then in any of the foregoing events, he shall receive in addition to compensation for temporary total disability under paragraph (b) of this Section, compensation at the rate provided in subparagraph 2.1 of paragraph (b) of this Section for that percentage of 500 weeks that the partial disability resulting from the injuries covered by this paragraph bears to total disability." 820 ILCS 305/8(d)(2) (West 1992).

It is axiomatic that words used in a statute are to be given their plain and commonly understood meaning and where the language of a statute is clear and unambiguous, the courts are obligated to enforce the law as enacted by the legislature. *Forest City Erectors v. Industrial Comm'n*, 264 Ill. App. 3d 436, 439 (1994). We conclude that the plain language of section 8(d) prohibits the Commission from awarding a percentage-of-the-person-as-a-whole award where the claimant has presented sufficient evidence to show a loss of earning capacity.

Under section 8(d)(2), in addition to TTD, a claimant receives compensation for that percent of 500 weeks that his partial disability bears to his total disability. 820 ILCS 305/8(d)(2) (West 1992). As a general matter, section 8(d)(2) applies to those cases in which a claim-

ant suffers injuries that partially incapacitate him from pursuing the usual and customary duties of his line of employment, but do not cause him to suffer an impairment of earning capacity. 820 ILCS 305/8(d)(2) (West 1992); see also, *Smith v. Industrial Comm'n*, 308 Ill. App. 3d 260, 265 (1999). The only time that section 8(d)(2) will apply where a claimant suffers an impairment of earning capacity is if the claimant waives his right to recover under section 8(d)(1). 820 ILCS 305/8(d)(2) (West 1992); *Freeman United Coal Mining Co. v. Industrial Comm'n*, 283 Ill. App. 3d 785, 790 (1996).

In addition, the word "shall" in section 8(d)(1) leads us to conclude that where a claimant proves that he is entitled to a wage-differential award, the Commission is without discretion to award a section 8(d)(2) award in its stead. As mentioned, the only exception to this rule is where the claimant waives his right to recover under section 8(d)(1). See 805 ILCS 305/8(d)(2) (West 1992). See *Freeman United*, 283 Ill. App. 3d at 791 (explaining that where the claimant could fit under either section 8(d)(1) or 8(d)(2), employee receives a wage-differential award unless he waives such right and opts for a percentage-of-the-person-as-a-whole award). Further supporting our interpretation is the inclusion of the waiver language in section 8(d)(2). This language would be rendered unnecessary if the legislature intended the Commission to have the sole discretion to elect a percentage-of-the-person-as-a-whole award even in those cases in which a claimant has proven entitlement to a wage-differential award.

■ Accordingly, our inquiry now becomes whether claimant qualifies for a wage-differential award. If claimant has requested a wage-differential award and he proves that he qualifies for one, the plain language of section 8(d)(1) requires that he be awarded a wage-differential award. If, however, claimant has failed to present any evidence regarding his entitlement to a wage-differential award, he will be deemed to have implicitly waived his right to such award. See *Freeman United*, 283 Ill. App. 3d at 791.

At the outset, we note that the cover page of the arbitrator's decision indicates that there was a section 8(d)(1) matter in dispute. Moreover, we have been unable to find any indication in the record that claimant expressly waived his right to a wage-differential award. Nevertheless, neither the Commission nor the arbitrator explicitly discussed the propriety of a wage-differential award. Therefore, implicit in their decisions was that claimant had not proven that he was entitled to a wage-differential award.

We will not overturn the Commission's compensation award unless it is against the manifest weight of the evidence. *Smith*, 308 Ill. App. 3d at 267. For a decision to be against the manifest weight of the

evidence, a review of the record must disclose that the conclusion opposite to that reached by the Commission was clearly the proper result. *Stapleton v. Industrial Comm'n*, 282 Ill. App. 3d 12, 16 (1996). In this case, we conclude that the record discloses that a conclusion opposite to that reached by the Commission was clearly the proper result.

■ To qualify for a wage-differential award under section 8(d)(1), claimant must prove (1) partial incapacity which prevents him from pursuing his "usual and customary line of employment," and (2) an impairment of earnings. 820 ILCS 305/8(d)(1) (West 1992); *Smith*, 308 Ill. App. 3d at 265; *Albrecht v. Industrial Comm'n*, 271 Ill. App. 3d 756, 759 (1995).

■ Claimant presented ample evidence that he is unable to return to his "usual and customary line of employment" as a tree trimmer. Both Drs. Nagle and McDonald testified to this fact. The functional capacity evaluation also indicates that claimant would be unable to return to work as a tree trimmer, and the labor market survey suggests the same. Further, a representative from Local 51 (Holcomb) opined that claimant would be unable to perform duties within any of the job classifications for which he is qualified. Therefore, we will focus on whether claimant demonstrated an impairment of earnings.

The object of section 8(d)(1) is to compensate an injured claimant for his reduced earning capacity, and if an injury does not reduce his earning capacity, he is not entitled to compensation. *Smith*, 308 Ill. App. 3d at 265-66. A claimant must prove his actual earnings for a substantial period before his accident and after he returns to work, or in the event that he is unable to return to work, he must prove what he is able to earn in some suitable employment. *Smith*, 308 Ill. App. 3d at 266.

In this case, the parties agreed that in the year preceding the accident claimant earned $46,363.20, and his average weekly wage was $891.60.

Further, claimant presented ample testimony that his injury reduced his earning capacity. In October 1994, claimant began inquiring about employment within his restrictions in the Tiskilwa/Princeton areas. He visited a mini-mart, a gas station, a bowling alley, automotive supply stores, a surgical supply company, and a garage. Claimant indicated that these jobs paid minimum wage. In 1996, claimant inquired about jobs at factories in the Princeton area. According to claimant the starting wages at these factories was $5.50 per hour.

Claimant also contacted employers identified in the labor market survey prepared on respondent's behalf. The survey identified four possible types of employment for claimant: tree-trimming supervisor, exterminator, storage rental clerk, and security guard. It also listed

employer contacts and vocational requirements for 21 jobs in the Peoria and Ottawa areas. Claimant was medically unable to work as a tree-trimming supervisor. Moreover, the labor market survey indicated that of the 21 employers surveyed, only one firm, Borg Security Services, had openings within claimant's restrictions. Borg was paying between $4.50 and $6 per hour. Claimant eventually found a job at Steimle Garage, earning $5.50 per hour, or $220 per week. Based on this evidence, it is evident that claimant's salary is commensurate with the prevailing wage for an individual with his experience, education, and restrictions. *Cf. Durfee v. Industrial Comm'n*, 195 Ill. App. 3d 886 (1990) (holding that the claimant, who was injured while working for respondent as a repairman, was not entitled to a section 8(d)(1) award where the claimant's physician suggested that the claimant return to work on a trial basis but the claimant elected to work as a minister and there was no evidence that he attempted to obtain any other kind of employment). Therefore, we find that the Commission's failure to award claimant a wage differential pursuant to section 8(d)(1) was against the manifest weight of the evidence.

Nevertheless, respondent argues that claimant is not entitled to a wage-differential award under section 8(d)(1). According to respondent, claimant has failed to establish his true earning capacity because he did not secure suitable employment within his restrictions. In particular, respondent asserts that claimant's job search between October 1994, when Dr. Nagle stated he reached maximum medical improvement, and October 1995 was "minimal" in both the number and geographical scope of employers contacted. In addition, respondent points out that claimant presented no documentation to support his claims that prospective employers did not have available work within his restrictions.

We find respondent's argument unpersuasive. There is no affirmative requirement under section 8(d)(1) that a claimant even conduct a job search. Rather, as discussed above, a claimant need only demonstrate an impairment of earnings. See *Albrecht*, 271 Ill. App. 3d at 759. Evidence of a job search is but one way to show impairment of earnings. In any event, we note that the type of job which claimant could perform was severely restricted. Nevertheless, claimant regularly inquired about positions within his restrictions at a mini-mart, a gas station, a bowling alley, auto parts stores, a surgical supply company, and a garage. Morever, in July 1994, respondent contacted claimant regarding a job as a flagger. Although claimant expressed interest in the position, respondent never followed through with an employment offer. In addition, claimant testified that between September 1994 and September 1995, he contacted IBEW Local 51 on at least four occasions in an attempt to find employment within his restrictions.

Admittedly, claimant limited his search to the Tiskilwa/Princeton areas. However, as the labor market survey demonstrated, given claimant's education, experience, and restrictions, even a search of a larger geographical area was unlikely to locate a position for claimant with a wage substantially greater than the wage paid at Steimle Garage. We emphasize that while the labor market survey listed 21 employers in four types of positions, only one of the employers had openings within claimant's restrictions. We note that there were employers listed on the labor market survey (notably the exterminating companies) that paid more than the position that claimant ultimately obtained. However, the survey indicated that no openings were available in these positions. Moreover, claimant testified that he contacted these companies and was not offered employment.

Finally, we reject respondent's contention that, because claimant did not provide any documentation regarding his job search, we should deny a wage-differential award. While claimant did not present any physical documentation regarding his job search, he named all of the employers to which he applied. Morever, for a majority of the employers, claimant provided the name of the person with whom he spoke. Respondent did not challenge any of this information. Thus, we find that claimant presented sufficient evidence regarding the nature and extent of his job search.

Since we find that claimant has demonstrated his entitlement to a wage-differential award under section 8(d)(1), we remand this cause to the Commission for a determination as to the amount of the award as well as the effective date of such award.

## B. TTD/Vocational Rehabilitation

Although claimant raises the issue of TTD as an alternative argument, we address it here so that there is no confusion regarding this issue on remand to the Commission. Claimant argues that the Commission's decision to deny TTD for the period beginning October 18, 1994, and ending January 6, 1996, was against the manifest weight of the evidence. According to claimant, pursuant to section 8(b) of the Act (820 ILCS 305/8(b) (West 1992)), he was entitled to TTD benefits until January 1996 because (1) he was only capable of performing sedentary work; (2) respondent refused to offer claimant employment within his restrictions; and (3) his efforts to find suitable employment within his restrictions were fruitless.

Section 8(b), which governs TTD awards, provides that weekly compensation shall be paid "as long as the total temporary incapacity lasts." 820 ILCS 305/8(b) (West 1992). Thus, as we have previously stated, an employee is temporarily totally incapacitated from the time

an injury incapacitates him for work until such time as he is as far recovered or restored as the permanent character of the injury will permit. See, *e.g., Beuse v. Industrial Comm'n*, 299 Ill. App. 3d 180, 182 (1998); *Manis v. Industrial Comm'n*, 230 Ill. App. 3d 657, 660 (1992). Accordingly, once an injured employee's condition stabilizes, he is no longer eligible for TTD benefits. *Hayden v. Industrial Comm'n*, 214 Ill. App. 3d 749, 754 (1991). Moreover, once an injured employee's condition has stabilized, he is no longer eligible for TTD benefits, although he may be entitled to PPD benefits. *Manis*, 230 Ill. App. 3d at 660, citing *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118 (1990). The period during which an employee is temporarily totally disabled is a factual determination. *Beuse*, 299 Ill. App. 3d at 182. As such, the Commission's decision will not be disturbed unless it is against the manifest weight of the evidence. *Beuse*, 299 Ill. App. 3d at 183.

The only evidence presented regarding the date of maximum medical improvement was Dr. Nagle's deposition testimony and his medical records and reports. In his deposition, Dr. Nagle first stated that claimant reached maximum medical improvement on October 18, 1994. He later suggested that claimant reached maximum medical improvement on the day he ordered claimant's functional capacity evaluation (August 16, 1994). Dr. Nagle also testified that claimant's condition remained virtually unchanged between his October 1994 and October 1995 visits. Based on this evidence, the Commission could find that claimant's condition had stabilized as of October 18, 1994. It was on that date that Dr. Nagle reviewed the results of the functional capacity evaluation with claimant. The arbitrator's decision was based on a statement in an August 16, 1994, report prepared by Dr. Nagle which indicated that claimant's recovery "*may* require twelve months or longer." (Emphasis added.) However, as is evident from this statement, Dr. Nagle's estimate was just that, an estimate. The doctor was free to later update his opinion regarding the date of maximum medical improvement. Based on this evidence, we cannot say that the Commission's determination that claimant reached maximum medical improvement on October 18, 1994, is against the manifest weight of the evidence.

Claimant also argues that he is entitled to maintenance pursuant to section 8(a) of the Act (820 ILCS 305/8(a) (West 1992)), because Dr. Nagle testified that claimant was a candidate for vocational rehabilitation and respondent denied his demand for retraining. A review of the record reveals that at the arbitration hearing claimant introduced, *inter alia,* a document requesting vocational rehabilitation from respondent and testimony that he did not receive vocational re-

habilitation. However, there is no indication that claimant argued this issue before the arbitrator or that he placed this issue in dispute. Moreover, we have conducted a thorough review of the record and note that this issue was not raised before the Commission or the circuit court. Accordingly, claimant has waived this issue for purposes of review. See *Manis*, 230 Ill. App. 3d at 661-62.

## C. Credit for Overpayment of TTD

■ Finally, claimant argues that the Commission committed legal error when it awarded respondent a credit of $42,000 in TTD overpayment against claimant's 60% person-as-a-whole award under section 8(d)(2). 820 ILCS 305/8(d)(2) (West 1992). Although we have determined in this case that claimant is entitled to a wage-differential award under section 8(d)(1) (820 ILCS 305/8(d)(1) (West 1992)), we have also concluded that the Commission properly determined that claimant reached maximum medical improvement on October 18, 1994, and that his TTD should have ended on that date. Therefore, the question of TTD overpayment remains, and this issue is ripe for consideration.

Claimant asserts that respondent is not entitled to a credit for TTD overpayments against a PPD award. Relying on *Bettis v. Oscar Mayer Foods Corp.*, 242 Ill. App. 3d 689 (1993), claimant argues that the statutory basis for the credit, section 8(j) of the Act (820 ILCS 305/8(j) (West 1992)), only allows a credit or setoff against TTD, and not PPD.

Initially, we note that the *Bettis* case was not decided by this court. Moreover, in *Messamore v. Industrial Comm'n*, 302 Ill. App. 3d 351 (1999), we addressed the precise issue raised by claimant here. In that case, the arbitrator awarded the claimant $50^4/_7$ weeks in TTD benefits and 38 weeks in PPD benefits. The TTD award was improperly inflated due to a clerical error. Realizing this, the Commission reduced the award of TTD benefits to only $24^6/_7$ weeks. The Commission further found that the respondent " 'shall have credit for all amounts paid to or on account of' " her injury. 302 Ill. App. 3d at 356. The circuit court confirmed the Commission's decision and held that any overpayment of TTD benefits could be credited against the claimant's PPD award. The claimant then appealed to this court.

We agreed with the circuit court that overpayment of TTD benefits could be credited against the claimant's PPD award. *Messamore*, 302 Ill. App. 3d at 359. We expressly distinguished *Bettis*, noting that the *Bettis* court was interpreting section 8(j)(1) of the Act (820 ILCS 305/ 8(j)(1) (West 1996)), which disallows credit against PPD awards where a claimant participates in a group plan. *Messamore*, 302 Ill. App. 3d at

357-58. In *Messamore*, there was no evidence that a group plan was at issue. Accordingly, section 8(j)(1) was inapplicable.

We then turned our attention to section 8(j)(2) of the Act (820 ILCS 305/8(j)(2) (West 1996)), which provides in pertinent part:

> "*Nothing contained in this Act* shall be construed to give the employer or the insurance carrier the right to credit for any benefits or payments received by the employee other than compensation payments provided by this Act, and where the employee receives payments other than compensation payments, \*\*\* the employer or insurance carrier shall receive credit for each such payment only to the extent of the compensation that would have been payable during the period covered by such payment." (Emphasis added.) 820 ILCS 305/8(j)(2) (West 1996).

Relying on section 8(j)(2), which we noted was not limited to benefits under group plans, we held that the respondent was entitled to a credit against the PPD award for TTD overpayments. *Messamore*, 302 Ill. App. 3d at 359.

Our holding in *Messamore* was also premised on public policy. In particular, we noted that the employee should not receive a windfall at the employer's expense due to an accidental overpayment of TTD benefits. *Messamore*, 302 Ill. App. 3d at 359. We further explained that one of the goals of the Act, *i.e.*, to encourage employers to make prompt payments before the amount of liability is certain, would be frustrated if we were to deny credits. *Messamore*, 302 Ill. App. 3d at 359. We also concluded that disallowing credits would encourage administrative delays as employers attempt to resolve every ambiguity before paying benefits. *Messamore*, 302 Ill. App. 3d at 359.

*Messamore* is directly on point here. Like the claimant in *Messamore*, there is no evidence that claimant in this case participated in a group plan. As a result, section 8(j)(1) and *Bettis* are inapplicable. We reiterate the policy reasons behind *Messamore* and hold that respondent is entitled to a credit against the PPD award for overpayment of TTD.

## III. CONCLUSION

For the aforementioned reasons, the decision of the circuit court of Bureau County, which confirmed the judgment of the Commission, is affirmed in part and reversed in part. We remand this cause to the

Commission so that it may enter an award pursuant to section 8(d)(1) of the Act consistent with the evidence herein.

Affirmed in part and reversed in part; cause remanded with directions.

McCULLOUGH, P.J., and HOLDRIDGE, RARICK, and ZWICK, JJ., concur.