# Illinois Official Reports

## Appellate Court

*Jackson Park Hospital v. Illinois Workers' Compensation Comm'n*,
2016 IL App (1st) 142431WC

| | |
|---|---|
| Appellate Court Caption | JACKSON PARK HOSPITAL, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Kathy Jenkins, Appellee). |
| District & No. | First District, Workers' Compensation Commission Division Docket No. 1-14-2431WC |
| Filed | January 8, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-051034; the Hon. Edward S. Harmening, Judge, presiding. |
| Judgment | Circuit court's judgment reversed; circuit court's remand order vacated; Commission's decisions vacated, in part; cause remanded. |
| Counsel on Appeal | Matthew J. Daley, of Odelson & Sterk, Ltd., of Evergreen Park, for appellant. |
| | Peter C. Bobber, of Hetherington, Karpel, Bobber & Miller, LLC, of Chicago, for appellee. |

Panel          JUSTICE STEWART delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1         The claimant, Kathy Jenkins, worked as a stationary engineer for the employer, Jackson Park Hospital. She sustained injuries to her neck, low back, and left knee in a work-related accident and can no longer perform the job duties required of a stationary engineer. She filed a claim pursuant to the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2006)). During the course of litigating the claimant's compensation claim, numerous contested issues arose between the parties. At this point in the proceeding, however, it is undisputed that the claimant is permanently and partially disabled because of her workplace accident and can no longer pursue the duties of her usual and customary line of employment. What remains in dispute is what benefits she is entitled to receive because of her permanent partial disability.

¶ 2         Section 8(d) of the Act governs this issue. It provides for the "amount of compensation which shall be paid to the employee for an accidental injury not resulting in death." 820 ILCS 305/8(d) (West 2012). Section 8(d) details two alternative types of compensation for employees who are permanently and partially disabled. Section 8(d)(1) provides for a wage differential award; alternatively, section 8(d)(2) provides for a percentage-of-the-person-as-a-whole award. 820 ILCS 305/8(d)(1), (2) (West 2012). The claimant argues that she is entitled to an award under section 8(d)(1), while the employer argues that she is entitled to an award under section 8(d)(2).

¶ 3         Although the claimant can no longer perform the duties required of a stationary engineer, at the time of the arbitration hearing, the employer continued to employ the claimant as a public safety officer at the same wage that she would have earned as a stationary engineer. The Commission, therefore, concluded that the claimant was not entitled to a wage differential award under section 8(d)(1) because she had not suffered any loss in wages. This finding lies at the heart of this appeal.

¶ 4         There is considerable procedural history leading up to this appeal that is critical to understanding and addressing the parties' contentions. Therefore, we will first briefly outline the proceedings below before detailing the factual background relevant to our analysis.

¶ 5         The parties' first hearing before an arbitrator took place on September 12, 2006, and was an expedited hearing pursuant to section 19(b) of the Act (820 ILCS 305/19(b) (West 2006)). The arbitrator awarded the claimant medical expenses, temporary total disability benefits, and penalties. The arbitrator's findings and awards made at that hearing are not at issue in this appeal.

¶ 6         The parties appeared before an arbitrator a second time almost five years later, on April 11, 2011, for a hearing on additional issues, including the claimant's request for permanent partial disability (PPD) benefits. The claimant requested a PPD award based on a wage differential pursuant to section 8(d)(1) of the Act. The arbitrator, however, denied the claimant's request

for an award under section 8(d)(1) and awarded her PPD benefits based on a percentage of the person as a whole under section 8(d)(2).

¶ 7 The arbitrator based his decision concerning the proper PPD award on a finding that the claimant had not suffered any reduction in her income because of her disability. The arbitrator acknowledged that the claimant could no longer perform the duties of a stationary engineer. However, the arbitrator focused on evidence that the employer continued to pay the claimant her previous wage rate while employing her in a light-duty, security officer position. The arbitrator concluded, therefore, that, because the claimant could not show an actual reduction in her income, she was not entitled to a wage differential award under section 8(d)(1). The claimant sought a review of the arbitrator's decision before the Commission.

¶ 8 Prior to the oral arguments in the review hearing before the Commission, the employer terminated the claimant's employment so that she no longer worked as a public safety officer and no longer earned the wage on which the arbitrator relied in denying her request for a wage differential award. Therefore, the claimant filed an emergency motion to remand the case to the arbitrator in order to reopen proofs to allow additional evidence of her termination.

¶ 9 The Commission denied her request to reopen the proofs. Subsequently, after oral arguments, it affirmed and adopted the arbitrator's decision without additional comment, denying the claimant's request for a PPD award under section 8(d)(1) and affirming and adopting the arbitrator's PPD award under section 8(d)(2). The claimant appealed the Commission's decision to the circuit court. The circuit court reversed the Commission's award under section 8(d)(2), finding that it was against the manifest weight of the evidence. The court remanded the claim to the Commission with directions for the Commission to enter a wage-differential award under section 8(d)(1).

¶ 10 On remand, the Commission entered a wage differential award. The employer appealed this decision to the circuit court, which entered a judgment that confirmed the Commission's decision on remand. The employer now appeals the circuit court's judgment.

¶ 11 On appeal, the employer asks this Court to reinstate the Commission's original PPD award under section 8(d)(2), arguing that it was not against the manifest weight of the evidence. The claimant asks us to affirm the Commission's wage differential award that it entered on remand under section 8(d)(1). Alternatively, she asks us to vacate both PPD awards and remand her claim to the Commission for an additional hearing on her request for a wage differential based upon the following claims: (1) the Commission abused its discretion in refusing to reopen proofs so she could present evidence of her employment termination and (2) the Commission abused its discretion at the time it entered the original PPD award under section 8(d)(2) by limiting the admission of certain evidence that was relevant to her request for an award under section 8(d)(1).

¶ 12 For the reasons explained below, we agree with the claimant's latter contention. The Commission abused its discretion by limiting the admission of an evidentiary stipulation the parties' submitted. In addition, the Commission failed to consider other evidence relevant to the issue of whether the claimant is entitled to a wage differential award. Therefore, we reverse the judgment of the circuit court that confirmed the Commission's decision on remand, vacate the circuit court's order that remanded this case to the Commission for a wage differential award, vacate both of the Commission's PPD awards, and remand this matter to the Commission for further proceedings on the claimant's request for a PPD award under section 8(d)(1).

BACKGROUND

¶ 14    The claimant's job as a stationary engineer required her to address all maintenance issues throughout the employer's hospital facility, including HVAC, plumbing, electrical, and other duties. The claimant's workplace accident occurred on October 25, 2005, when she attempted to gain entry into a locked office through a sliding glass window. She climbed through the window, into a dark office, and onto an unsteady desk. She then stepped onto a desk chair that rolled away from her. She fell toward the ground and twisted her body. She immediately experienced pain in her left lower back. The pain went down her left leg and to her knee.

¶ 15    Following the accident, the claimant underwent a course of medical treatment for neck, knee, and low back pain. Her treatments included an emergency room visit, physical therapy, medications, and trigger point injections. Her treating physician, Dr. Herman Morgan, released her to light-duty work on January 18, 2006, with a restriction of lifting no more than 30 pounds. The employer did not offer the claimant light-duty work at that time. Due to financial hardship, the claimant requested that Dr. Morgan release her to full-duty work, which he did effective January 30, 2006. The claimant returned to full-duty work on that day.

¶ 16    After the claimant returned to full-duty work, she noticed increased pain in her left lower back and left knee. Dr. Morgan took the claimant off work and referred her to Dr. Egwele. On April 29, 2006, Dr. Egwele performed surgery on the claimant's left knee. Dr. Egwele's postoperative diagnoses involved various left knee conditions, including an unstable undersurface tear of the posterior horn of the medial meniscus, chondromalacia of the patella and medial femoral condyle, hypertrophic synovitis, and contusion of the anterior cruciate ligament. Following the surgery, the claimant underwent physical therapy, and Dr. Egwele released the claimant to return to work in a sedentary position as of June 1, 2006. At that time, the employer did not offer the claimant any work within her restrictions.

¶ 17    The parties appeared before an arbitrator on September 12, 2006, for an expedited hearing pursuant to section 19(b) of the Act (820 ILCS 305/19(b) (West 2006)). At the hearing, the claimant testified that she suffered from pain and stiffness in her left knee and occasionally in her left low back, especially while walking, standing, or climbing stairs. At that time, she remained under the care of Dr. Egwele, had not returned to work anywhere, and had not been released to full duty work.

¶ 18    The arbitrator found that the claimant sustained an injury that arose out of and in the course of her employment. The arbitrator also found that there was a causal relationship between the accident and the claimant's "conditions of ill-being involving her neck/right shoulder area, low back[,] and left leg." The arbitrator awarded the claimant medical expenses, temporary total disability benefits, and section 19(*l*) penalties (820 ILCS 305/19(*l*) (West 2006)). Neither party sought review of this decision, and it became a final award of the Commission.

¶ 19    After the September 12, 2006, section 19(b) hearing, the claimant continued treating with Dr. Egwele, and her treatments included physical therapy for her low back and left knee pain and stiffness. In February 2007, she underwent a functional capacity evaluation, which placed her at the light physical demand level and unable to perform the job duties required of her previous position as a stationary engineer. The evaluator noted that the claimant was unable to perform any prolonged stooping, kneeling, or squatting; was unable to lift or carry loads up to 50 pounds; and was unable to perform any prolonged standing or walking. After the evaluation, Dr. Egwele concluded that the claimant could return to work only at the sedentary level on a permanent basis.

¶ 20     On February 19, 2007, the employer first offered the claimant light-duty work in its accounting department. She returned to work and performed clerical duties that included sorting, stapling, and filing papers. She testified that she experienced left knee stiffness and low back pain if she sat more than one hour, but she could handle the job because it allowed her to sit and stand as needed and only required minimal walking. She performed this job for approximately three months, and the employer paid her compensation at the same rate as a stationary engineer. The employer then transferred her to its employee health department where she performed similar clerical duties for two months at the same rate of pay.

¶ 21     In July 2007, the employer transferred the claimant to its security department where she worked as a public safety officer. The evidence presented at the arbitration hearing established that the claimant did not meet the employer's requirements to work as a public safety officer and that the employer's public safety officers earned less than a stationary engineer. Nonetheless, the employer transferred the claimant to perform the duties of a safety officer and paid her the same wage that she would have earned as a stationary engineer.

¶ 22     Initially, the claimant's duties included watching monitors, and she could alternate her sitting and standing positions while she performed this job. She noticed that her left knee and low back got stiff and painful if she sat for longer than one hour. After working in this capacity for two months, the employer relocated her to its security tower, which required her to climb stairs into the tower and watch over the parking lot. She also rode in a van once a month to drop off and pick up documents. She occasionally filled in for another safety officer in the hospital's lobby over the lunch hour. While performing these job duties, she was able to alternate her sitting and standing with sufficient frequency to minimize her low back pain and left knee pain and stiffness.

¶ 23     On June 21, 2011, the parties appeared before an arbitrator for a hearing to determine additional medical expenses, causal connection, the nature and extent of her work-related injury, and her request for PPD benefits. At the time of the June 21 hearing, the claimant still worked as a public safety officer for the employer, and the arbitrator found that this job was within her work restrictions.

¶ 24     The evidence at the arbitration hearing established that the employer employed 25 public safety officers. The claimant testified that the employer's public safety officers started at a wage of $8.34 per hour and that they were required to (1) undergo a 20-hour certification class and (2) possess a high school diploma. She testified that she never underwent the certification class and did not have a high school diploma. She had an eighth grade education and had failed the GED test on two occasions.

¶ 25     The evidence presented at the arbitration hearing included a stipulation entered into between the parties. The stipulation arose because the claimant subpoenaed two hospital employees to testify at the hearing: the security department supervisor and the payroll coordinator. In order to "alleviate the necessity of those two individuals missing work," the parties stipulated to two issues of fact to which the witnesses would have testified. The first stipulation was that the witnesses would testify that "ever since [the employer] has been providing [the claimant] light duty work, [the employer has] maintained her pay at her stationary engineer union pay rate, $23.61 per hour." The second stipulation was that the witnesses would testify that, at the time of the hearing, the claimant was "working as a public safety officer" for the employer and that the employer's "other public safety officers [were] presently paid between $8 and $10 per hour."

¶ 26    Although the employer stipulated to the facts to which the witnesses would have testified, it objected to the relevancy of the testimony. The arbitrator ruled that the stipulated facts were relevant "only as far as [a section 8(d)(2)] award, but not relevant to any kind of wage loss because she doesn't have a wage loss, at this time." In response, the claimant made an "offer of proof" by requesting that the "facts be admitted for all purposes" and "[s]pecifically *** for a potential [section 8(d)(1)] or wage differential consideration or award."

¶ 27    The claimant testified that she had a stationary engineer license issued by the City of Chicago but had no other professional licenses or certifications. She had never undergone any training as a security guard, did not possess a Permanent Employee Registration (PERC) card or a Firearm Owner Identification (FOID) card, did not have a license to carry a weapon, and was not licensed by the State of Illinois as a security guard.

¶ 28    The evidence presented at the arbitration hearing included a vocational assessment report prepared by a certified vocational rehabilitation counselor, Edward J. Rascati. Rascati concluded that, in the Chicago area, security guard positions usually pay between $9 and $11 per hour and that the claimant's earnings in excess of $23 per hour were not indicative of other security positions in the Chicago area. Rascati opined that the claimant's vocational potential was limited by her lack of a GED and because her skills as a stationary engineer were no longer transferable due to her work restrictions. He concluded that, because of her restrictions and lack of a GED, she was at a "severe disadvantage" in the competitive job market. Rascati went as far as to conclude that "there is not presently a viable and stable labor market for [the claimant]." However, he believed that "if she were able to find an employer willing to hire her without a degree/GED," then she might be suitable for employment as a cashier, gas station attendant, parking lot attendant, or central station monitor, positions that would pay between $8 and $9 per hour.

¶ 29    At the conclusion of the arbitration hearing, the arbitrator found that the claimant was unable to perform the required physical activities of her prior occupation of stationary engineer. However, the arbitrator also concluded that the claimant had not proven an impairment of earning capacity as a result of her physical incapacity. Therefore, he denied her request for a wage differential award. Specifically, the arbitrator found as follows:

> "[The claimant] is presently not suffering any impairment of earnings as she continues to earn the same rate of pay that she would have been earning as a [s]tationary [e]ngineer. Nonetheless, she is incapacitated from pursuing other suitable occupations and as such significantly limits her ability to locate suitable employment in the labor market. As such, the [arbitrator] concludes that as a result of her October 25, 2005, work injury, [the claimant] has sustained a 40% loss of use, man as a whole, pursuant to Section 8(d)(2) of the Act."

¶ 30    The claimant and the employer both sought a review of the arbitrator's decision before the Commission. The Commission originally scheduled oral arguments in the matter for April 5, 2012, but the claimant's attorney stated that he did not receive notice of the hearing. Therefore, the Commission rescheduled the arguments for a later date.

¶ 31    On April 16, 2012, the employer terminated the claimant's employment. Eleven days later, her attorney filed an emergency motion to continue oral arguments before the Commission and to reopen the proofs before the arbitrator in order to present evidence of her employment termination. The claimant argued in the motion that her termination was relevant to her pending request for a wage differential award.

¶ 32 The Commission conducted a hearing on the motion to reopen proofs on May 8, 2012. On August 12, 2012, the Commission entered an order denying the claimant's request to reopen proofs. In denying the motion, the Commission stated that "there is no ambiguity claimed in the record herein to warrant reopening the proofs." The Commission also stated that, "other than the lay-off, there is no change in [the claimant's] condition from the time of hearing to justify remanding the matter to re-open proofs." The Commission added that, but-for the claimant's attorney's claim that he did not receive notice of the April 5, 2012, hearing, the case would have been heard and decided before the claimant's "unfortunate lay-off." The Commission further explained its ruling as follows:

"[The claimant] at hearing failed in their [*sic*] attempt to prove wage differential given [the claimant] was earning her same wages then working in security under permanent light duty restrictions. To remand this matter to the [a]rbitrator at this time in order to re-open proofs would give [the claimant] a second chance at proving wage differential while unjustly prejudicing [the employer]. The Review is still pending and oral arguments should proceed thereon for the Commission's consideration and determination as to whether the award was appropriate or not. [The claimant's] motion is herein denied and orders the matter to proceed for oral arguments under the pending Review."

¶ 33 The matter proceeded to oral argument before the Commission. On November 5, 2012, the Commission entered an order affirming and adopting the arbitrator's decision without further comment.

¶ 34 The claimant appealed the Commission's decision to the circuit court and challenged the Commission's award of benefits under section 8(d)(2) of the Act. In addition, she argued that the Commission abused its discretion by refusing to grant her motion to remand the case to the arbitrator to reopen the proofs and in limiting the purpose for the submission of the parties' factual stipulation concerning the wages earned by the employer's public safety officers.

¶ 35 On judicial review, the circuit court held that the Commission's award of section 8(d)(2) benefits was against the manifest weight of the evidence. The court remanded the case to the Commission for the determination of a wage differential award pursuant to section 8(d)(1) of the Act.

¶ 36 On remand, the Commission stated in its decision that it found no evidence in the record that warranted altering its prior decision. However, in compliance with the circuit court's order, it modified its PPD award and granted the claimant a wage differential of $389.60 per week, from February 19, 2007, through the duration of her disability, under section 8(d)(1) of the Act. The Commission noted that the "wage differential represents 2/3 of the difference between the 23.61/hour [the claimant] would be able to earn in the full performance of her occupation as a [s]tationary [e]ngineer and the $9.00/hour she would be able to earn in some suitable alternative employment."

¶ 37 The employer appealed the Commission's decision on remand, and the circuit court entered a judgment confirming the decision. The employer now appeals the circuit court's final judgment.

¶ 39    The employer does not dispute the Commission's finding that the claimant has sustained a work-related permanent partial disability. Under the Act, when a claimant sustains a disability, an issue arises concerning what type of compensation she is entitled to receive, a wage differential award (section 8(d)(1)) or a percentage-of-the-person-as-a-whole award (section 8(d)(2)). 820 ILCS 305/8(d) (West 2012); *Gallianetti v. Industrial Comm'n*, 315 Ill. App. 3d 721, 727, 734 N.E.2d 482, 487 (2000). The supreme court has expressed a preference for wage-differential awards. *Gallianetti*, 315 Ill. App. 3d at 727, 734 N.E.2d at 487 (citing *General Electric Co. v. Industrial Comm'n*, 89 Ill. 2d 432, 438, 433 N.E.2d 671, 674 (1982)). The purpose of a wage differential award under section 8(d)(1) is to compensate an injured claimant for her reduced earning capacity. *Dawson v. Illinois Workers' Compensation Comm'n*, 382 Ill. App. 3d 581, 586, 888 N.E.2d 135, 139 (2008).

¶ 40    Section 8(d)(1) of the Act sets out the two requirements for a wage differential award. Under section 8(d)(1), an impaired worker is entitled to a wage differential award when (1) she is "partially incapacitated from pursuing [her] usual and customary line of employment" and (2) there is a "difference between the average amount which [she] would be able to earn in the full performance of [her] duties in the occupation in which [she] was engaged at the time of the accident and the average amount which [she] is earning or is able to earn in some *suitable employment* or business after the accident." (Emphasis added.) 820 ILCS 305/8(d)(1) (West 2012).

¶ 41    Alternatively, section 8(d)(2) of the Act provides for a PPD award based on a percentage-of-the-person-as-a-whole, rather than a wage differential, under three circumstances (only one of which is relevant in the present case): when the claimant's injuries do not prevent her from pursuing the duties of her employment but she is disabled from pursuing other occupations or is otherwise physically impaired; when her "*injuries partially incapacitate [her] from pursuing the duties of [her] usual and customary line of employment but do not result in an impairment of earning capacity*"; or when the claimant having suffered an "impairment of earning capacity *** elects to waive [her] right to recover under [section 8(d)(1)]." (Emphasis added.) 820 ILCS 305/8(d)(2) (West 2012).

¶ 42    When section 8(d)(1) is construed in conjunction with section 8(d)(2), it becomes clear that the crucial issue in the present case in determining which type of PPD award is appropriate is whether the claimant has suffered an impairment of her "earning capacity." The employer does not dispute the Commission's finding that the claimant is incapacitated from pursuing her "usual and customary line of employment." Therefore, a percentage-of-the-person-as-a-whole award under section 8(d)(2) would be appropriate *only* if she has suffered no loss in her "earning capacity," or having suffered a loss in "earning capacity," she elected to waive her right to an award under section 8(d)(1). 820 ILCS 305/8(d)(2) (West 2012); *Lenhart v. Illinois Workers' Compensation Comm'n*, 2015 IL App (3d) 130743WC, ¶ 48, 29 N.E.2d 648; *Gallianetti*, 315 Ill. App. 3d at 728, 734 N.E.2d at 488 ("the plain language of section 8(d) prohibits the Commission from awarding a percentage-of-the-person-as-a-whole award where the claimant has presented sufficient evidence to show a loss of *earning capacity*" (emphasis added)).

¶ 43    The claimant in the present case has not waived her right to a section 8(d)(1) award. Therefore, the linchpin factual issue in the present case is a determination of whether the

claimant's work-related injuries have resulted in an "impairment of earning capacity." 820 ILCS 305/8(d)(2) (West 2012).

¶ 44    The Commission in the present case did not evaluate the claimant's "earning capacity." Instead, the Commission simply looked at the claimant's post-injury wages and denied her request for a wage differential award because "she does not have any wage loss, at this time." This analysis is flawed. The supreme court has held that "[a]lthough wages are indicative of earning capacity, they are not necessarily dispositive." *Cassens Transport Co. v. Illinois Industrial Comm'n*, 218 Ill. 2d 519, 531, 844 N.E.2d 414, 425 (2006). The test does not focus exclusively on the amount earned, but instead focuses on the *capacity* to earn. *Id*. "[P]ost-injury earnings and earning capacity are not synonymous" because other evidence can show that "the actual earnings do not fairly reflect claimant's capacity." 4 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 81.03(1) (2015). For example, "[w]ages paid an injured employee out of sympathy, or in consideration of long service with the employer, clearly do not reflect his or her actual earning capacity *** [and should] be discounted accordingly." 4 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 81.06 (2015).

¶ 45    Therefore, whether the claimant has sustained an impairment of earning capacity cannot be determined by simply comparing pre- and post-injury income. The analysis requires consideration of other factors, including the nature of the post-injury employment in comparison to wages the claimant can earn in a competitive job market.

¶ 46    In the present case, the Commission did not conduct any analysis to determine whether the claimant's post-injury wages reflected her true earning capacity in a competitive job market. On the contrary, at the arbitration hearing, the claimant attempted to present evidence that her income as a public safety officer was not a true representation of her earning capacity, but the Commission refused to consider the evidence. The claimant presented evidence, by way of the stipulation, that although she was earning $23.61 per hour as a safety officer for the employer, all of the employer's other safety officers earned between $8 and $10 per hour. The Commission refused to admit this stipulation for purposes relevant to the claimant's request for a wage differential award. It admitted the stipulation "only as far as [a section 8(d)(2)] award."

¶ 47    We review evidentiary rulings made during the course of a workers' compensation proceeding under the abuse of discretion standard. *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1010, 832 N.E.2d 331, 340 (2005). An abuse of discretion occurs when no reasonable person would take the view adopted by the Commission. *Hagemann v. Illinois Workers' Compensation Comm'n*, 399 Ill. App. 3d 197, 204, 941 N.E.2d 878, 884 (2010). In the present case, the Commission abused its discretion in limiting the admission of the stipulation.

¶ 48    The evidence presented at the arbitration hearing also included testimony that the claimant had only an eighth-grade education and that her job skills as a stationary engineer were not transferable because of her physical limitations. The only vocational expert who testified at the hearing, Rascati, offered an unrebutted opinion that the claimant might be able to procure entry level, unskilled employment as a cashier, gas station attendant, parking lot attendant, or central station monitor. In these positions, the claimant would earn between $8 and $9 per hour, far less than the $23.61 per hour the employer paid the claimant at the time of the hearing. The evidence presented at the hearing included testimony that the claimant did not actually meet the qualifications necessary to work as a public safety officer for the employer and that safety

officers in the Chicago area, including all of the employer's other safety officers, typically earned between $8 and $11 per hour. Rascati told the Commission in his report that the claimant's earnings in excess of $23 per hour were not indicative of other security positions in the Chicago area.

¶ 49 Despite this evidence, the Commission concluded that the claimant's earning capacity was unaffected by her work-related disability and based its decision entirely on the post-injury wages that the employer paid the claimant at the time of the hearing. Because the Commission failed to consider and analyze all of the evidence that is relevant to the claimant's true earning capacity in the competitive job market, we must vacate the Commission's PPD awards and remand for a proper hearing on the claimant's request for a wage differential PPD award.

¶ 50 We acknowledge that the employer's argument on appeal raises a competing concern, *i.e.*, that the Commission's focus solely on the claimant's post-injury income is proper because, otherwise, there is a danger that a person could be awarded a wage differential award while still earning the same wages. However, under the Act, the claimant is entitled to a wage differential award if there has been an impairment of her earning capacity, and, as noted above, the supreme court has held that income and capacity are not synonymous. *Cassens Transport Co.*, 218 Ill. 2d at 531, 844 N.E.2d at 425. Therefore, the Commission's analysis cannot focus exclusively on a comparison of pre- and post-injury income when other evidence is offered that is relevant to the employee's earning capacity in the competitive job market.

¶ 51 Furthermore, under the employer's interpretation of the Act, an injured worker could be denied a wage differential award simply because the employer pays the injured worker an inflated wage in an employer-controlled job that does not otherwise exist in the labor market and which may be temporary in duration. If other employers would not hire the employee with her limitations at a comparable wage level, the post-injury wage cannot be considered an accurate reflection of the claimant's earning capacity. Denying such a claimant a wage differential award undermines the purpose of such awards, which is to compensate the injured worker for her reduced earning capacity. *Dawson*, 382 Ill. App. 3d at 586, 888 N.E.2d at 139. It is essential for the Commission to consider all of the evidence relevant to the claimant's actual earning capacity in the competitive job market in determining whether the claimant is entitled to a wage differential award.[1] In the present case, because the Commission did not conduct the proper analysis and limited the admission of relevant evidence, we must vacate the Commission's PPD awards and remand for further proceedings on this issue.

¶ 52 In remanding this case to the Commission for additional proceedings, we find the case of *Smith v. Industrial Comm'n*, 308 Ill. App. 3d 260, 719 N.E.2d 329 (1999), to be instructive. In that case, the claimant worked as a security supervisor officer, injured her shoulder in a work-related accident, and could no longer perform her job duties as a result of the accident. An arbitrator awarded the claimant PPD benefits based on a wage differential award under section 8(d)(1), but the Commission vacated that award and granted a PPD award under section 8(d)(2). *Id.* at 264, 719 N.E.2d at 332. On appeal, the court held that the Commission's

---

[1]Although this case involves a claim that the claimant's wages were artificially inflated, we also note that an employer who believes that a claimant's current earnings are artificially low should be allowed to present evidence that those earnings do not represent the claimant's true earning capacity. Such evidence should be considered by the Commission to determine whether the claimant is entitled to a wage differential award and, if so, in what amount.

finding that the claimant failed to prove a reduced earning capacity was against the manifest weight of the evidence. Therefore, the court reinstated the arbitrator's wage differential award. *Id*. at 267-68, 719 N.E.2d at 335.

¶ 53 In *Smith*, the claimant earned $14.70 per hour in the year preceding her accident. After being off work for some time, she returned to work for the employer in a position within her impairment restrictions, earning $9.75 per hour, which was the same rate as other employees working in the same capacity and with the same seniority. However, the employer subsequently increased the claimant's wage to $15 per hour and did not provide her with any reason for the wage increase. *Id*. at 266, 719 N.E.2d at 333-34. Her duties remained the same, and other employees working in the same capacity continued to earn $9.75 per hour. *Id*. at 266, 719 N.E.2d at 334. The employer's security manager "acknowledged that he might have been involved in conversations wherein claimant's workers' compensation supervisor told him to raise her wages due to the pending workers' compensation case." *Id.*

¶ 54 In determining whether a wage differential award was appropriate, the Commission in *Smith* made the same error as the Commission in the present case; it simply looked at the claimant's wage at the time of the hearing and concluded that an award under section 8(d)(2) was more appropriate without considering any other factors relevant to the claimant's true earning capacity. *Id*. On appeal, however, the court held that the $15 per hour that the claimant was being paid at the time of the hearing did not truly reflect what she was able to earn; the court stated that the employer artificially raised her wage above what is normally paid for the services she performed. *Id*. at 267, 719 N.E.2d at 334. The court held that the claimant's actual earning capacity was the normal pay rate of $9.75 per hour. *Id*. The court further explained as follows:

> "Here, although at the time of hearing claimant was being paid at the rate of her previous position as a security supervisory officer, we cannot ignore the fact that the arbitrator, the Commission, and the circuit court all recognized that the employer raised claimant's wages in an attempt to avoid a [wage differential] award. This fact, in and of itself, supports a finding that claimant's actual earning capacity was $9.75 per hour. We believe, therefore, that claimant proved impaired earning capacity, and as a result, the Commission's decision not to affirm the arbitrator's [wage differential] award was against the manifest weight of the evidence." *Id*. at 267, 719 N.E.2d at 334-35.

¶ 55 In the present case, the record includes evidence that the employer paid the claimant to perform job duties that she was not qualified to perform and paid her a wage "above what is normally paid for such services." See *id*. at 267, 719 N.E.2d at 334. The Commission did not consider this evidence but simply adopted the arbitrator's incorrect conclusion that the evidence "was not relevant to any kind of wage loss because she does not have a wage loss, at this time." For the reasons noted above, this evidence is relevant in analyzing the factual issue of whether the claimant has suffered an impairment to her earning capacity, which is the crucial issue in determining whether the claimant is entitled to a wage differential award.

¶ 56 The employer argues that *Smith* is distinguishable because, in *Smith*, there was evidence that the employer artificially raised the employee's wage in an attempt to defeat the employee's wage differential claim. We agree with the employer that, in contrast, in the present case, there is no evidence in the record to support a finding that the employer artificially inflated the claimant's wages for the specific purpose of defeating her claim for a wage differential award. Nonetheless, this fact does not make *Smith* irrelevant to our analysis.

- 11 -

¶ 57    In *Smith*, the court's task was to review the record to determine whether the claimant proved an impairment to her "earning capacity." *Id.* at 267, 719 N.E.2d at 334-35 ("We believe *** that claimant proved impaired *earning capacity*, and as a result, the Commission's decision not to affirm the arbitrator's [wage differential] award was against the manifest weight of the evidence." (Emphasis added.)). The court's task was not to review the record to determine whether there was a basis to penalize the employer for its conduct. The court's analysis in *Smith* focused on whether the wage that the employee earned at the time of the arbitration hearing accurately reflected her earning capacity. The facts in *Smith* included evidence that the employer artificially inflated the claimant's wage in an attempt to avoid a wage differential award, and the court found that this fact was enough to conclude that the employee's wages at the time of the hearing did not accurately reflect her earning capacity and that her actual earning capacity was $9.75 per hour.

¶ 58    In the present case, the Commission's task is identical to its task in *Smith*. That task is to admit and consider all evidence relevant to the claimant's earning capacity, including evidence relevant to the issue of whether the post-injury wage that the claimant earned at the time of the arbitration hearing accurately reflected her true earning capacity. Although the facts of the present case do not include evidence of an intentional effort on the part of the employer to defeat the claimant's wage differential claim by manipulating her wage, the facts of the present case include other evidence relevant to determining whether $23.61 per hour accurately represents the claimant's true earning potential in a competitive job market. The Commission erred in failing to consider this evidence.

¶ 59    In addition to *Smith*, cases from other jurisdictions support our analysis. In *Allen v. Industrial Comm'n*, 347 P.2d 710 (Ariz. 1959), a salesperson who was injured in a work-related accident returned to work after the accident. *Id.* at 711-12. His doctor testified that he could not work as efficiently as before the accident, and other evidence established that the employee would not be employed by other similar companies and that the employer would not have hired a person in the employee's condition if not for the company's policy to keep disabled workers on the job at the same pay. *Id.* at 712.

¶ 60    The Arizona Industrial Commission found that the employee suffered no loss of earning capacity because he was employed after his injury at no reduction in wages. *Id.* The Arizona Supreme Court reversed, holding that post-accident earnings were not the conclusive measure of earning capacity. *Id.* at 716. The court noted that other considerations must be factored to determine whether post-injury earnings exaggerated the injured worker's earning capacity and were only temporary in nature. *Id.* The court noted that the only evidence in support of the Commission's finding was the actual post-injury earnings. *Id.* at 717-18. The court concluded that the Commission erred in not evaluating the earnings in light of other relevant evidence, including the employer's policy to retain injured workers at their previous wages. *Id.* The court concluded, "Thus, wages may reflect not the employee's earning capacity in a competitive situation but rather a company policy which, if abrogated for any reason by the employer, will force the employee into a position where he will be unable, because of his injuries, to continue to earn such wages or secure equivalent employment." *Id.* at 718.

¶ 61    In *Peoples v. Cone Mills Corp.*, 342 S.E.2d 798, 806 (N.C. 1986), the Supreme Court of North Carolina highlighted the problem with blindly accepting an employer's payment (or offer of payment) of post-injury wages as the measure of earning capacity without considering it in reference to the competitive job market. The court stated:

"The rationale behind the competitive measure of earning capacity is apparent. If an employee has no ability to earn wages competitively, the employee will be left with no income should the employee's job be terminated. Termination of the employee would not necessarily signal a bad motive on the part of the employer. An employer facing a business decline reasonably could determine that continued retention of the employee was not feasible. The employee could also be dismissed for misconduct. The employer could, for reasons beyond its control, simply cease doing business." *Id.*

See also *Magma Copper Co. v. Industrial Comm'n*, 395 P.2d 616, 619 (Ariz. 1964) ("[T]he proper test in finding the loss of earning capacity is to determine as nearly as possible whether in a competitive labor market the subject in his injured condition can probably sell his services and for how much."); *Doles v. Industrial Comm'n*, 810 P.2d 602, 604 (Ariz. Ct. App. 1991) ("Earning capacity *** cannot be accurately measured by make-work or sheltered work.").

¶ 62 In the present case, it was the duty of the Commission to admit and factor all of the evidence concerning the nature of the claimant's post-injury employment with the employer, not simply compare her pre- and post-injury wages. It was also the duty of the Commission to factor other evidence concerning positions available to the claimant in the competitive job market based on her restrictions and job skills and determine whether her disability has resulted in an impairment of earning capacity. The Commission did not do so. Therefore, we must remand this case for further hearings on the issue of the claimant's request for a wage differential award, during which the Commission shall admit and consider all evidence relevant to the claimant's actual earning capacity in the competitive job market.

¶ 63                                    CONCLUSION

¶ 64 For the foregoing reasons, we reverse the judgment of the circuit court entered on July 15, 2014, that confirmed the Commission's decision. We also vacate the Commission's October 21, 2013, PPD award on remand under section 8(d)(1), vacate the circuit court's May 29, 2013, order remanding the case to the Commission with directions to enter a wage differential award under section 8(d)(1), vacate the Commission's PPD award under section 8(d)(2) that was entered on November 5, 2012, and remand to the Commission for further proceedings consistent with this opinion.

¶ 65 Circuit court's judgment reversed; circuit court's remand order vacated; Commission's decisions vacated, in part; cause remanded.

- 13 -