ROPER CONTRACTING v. THE INDUSTRIAL COMMISSION *et al.* (Larry Grabis, Appellee).

Fifth District (Industrial Commission Division)    No. 5—03—0713WC

Opinion filed June 16, 2004.

Kenneth S. Bina, of Livingstone, Mueller, O'Brien & Davlin, P.C., of Springfield, for appellant.

Ron D. Coffel, of Ron Coffel & Associates, of Benton, and Darrell Dunham, of Elkville, for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

Roper Contracting (Roper) appeals from a circuit court order confirming a decision of the Industrial Commission (Commission), awarding permanent partial disability (PPD) benefits, temporary total disability (TTD) benefits, travel expenses and maintenance payments to the claimant, Larry Grabis, in connection with his application for adjustment of claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2002)). For the reasons that follow, we affirm.

On July 31, 2000, the claimant filed an application for adjustment of claim alleging that he had suffered an accidental injury on January 17, 2000, while working for Roper. An arbitration hearing was held on September 21, 2001, during which the following facts were established by the testimony and exhibits presented.

The claimant began working for Roper as a heavy equipment mechanic and super fueler in 1999. As part of the claimant's job, he was required to lift tools weighing 50 to 60 pounds over his head. He was also responsible for refueling Roper's fleet of heavy machinery each morning before the rest of the crew arrived. On January 17, 2000, shortly after the claimant began work and while he was climbing into a fueling truck, the claimant slipped and began to fall from a fender on the truck. To prevent his fall, the claimant extended his left arm and grabbed onto the door of the fueling truck. While the claimant managed to stop his fall, he immediately noticed pain and loss of motion in his left arm and shoulder.

Later that day, the claimant visited his family doctor, Dr. Tom Martin, who diagnosed the claimant with a left rotator cuff tear. The claimant returned to work until March 9, 2000, when he once again visited Dr. Martin complaining of pain and loss of motion in his left

shoulder. Dr. Martin referred the claimant to Dr. Alan H. Johnston, an orthopedic surgeon, who ordered an arthrogram of the claimant's left shoulder. An arthrogram was performed on March 16, 2000, and showed a complete tear in the claimant's left rotator cuff. On April 7, 2000, Dr. Johnston operated on the claimant's left shoulder in order to repair his rotator cuff.

After several months of physical therapy with minimal improvement, Dr. Johnston performed a left shoulder manipulation under anesthesia on August 8, 2000, in order to resolve the claimant's adhesive capsulitis. Following the claimant's shoulder manipulation, he continued a regimen of physical therapy at the Harrisburg Medical Center in Harrisburg, Illinois. In a letter dated December 22, 2000, the claimant was informed that his worker's compensation carrier had refused to pay for further physical therapy at the Harrisburg Medical Center, but that the carrier was willing to pay for the claimant's therapy and travel expenses for treatment at the Work Place Center of Deconess Hospital in Evansville, Indiana. Thereafter, the claimant's physical therapy took place at the Work Place Center.

In a report from the Work Place Center dated March 2, 2001, the claimant was reported as indicating interest in exploring vocational rehabilitation to "possibly become an equipment operator." A subsequent report from March 19, 2001, recommended that if the claimant was unable to resume working at Roper he would benefit from a vocational rehabilitation program with retraining in an occupation which required less overhead lifting.

At Roper's request, the claimant was examined by Dr. Frank Petkovich on October 16, 2000. In his report of that examination, Dr. Petkovich stated that he had reviewed the claimant's medical records, arthrogram and operative reports and had conducted his own independent medical examination. The doctor opined that although the claimant had made some progress since surgery he still had significant limitation in his range of motion and strength in his left shoulder. Dr. Petkovich also stated that the claimant could work at "lighter duty activities" with restrictions that the claimant not lift more than eight pounds or perform any overhead work with his left upper extremity.

On March 21, 2001, Dr. Johnston examined the claimant and found his range of motion and strength "somewhat" limited in the upper left extremity. The doctor stated that the claimant could "abduct the left arm about 105°, externally rotate 18°, and abduct 3° with pain predominately at the limits of his motion." Dr. Johnston placed the claimant at maximum medical improvement (MMI), and authorized his return to work with restrictions of no overhead reaching of the left

upper extremity and no lifting greater than 15 pounds on a repetitive basis of the left upper extremity.

On March 26, 2001, the claimant returned to Roper in order to discuss his return to work with his supervisor, Jerry Kemp. After informing Kemp of his work restrictions, the claimant was told that there was no work suitable for him and that he should sign up for unemployment. The claimant's temporary total disability payments were terminated on April 18, 2001.

On May 18, 2001, the claimant was once again examined, at Roper's request, by Dr. Petkovich. The doctor reviewed the claimant's extensive medical records, including a report from the claimant's prior independent examination on October 16, 2000, and performed a thorough medical examination. Dr. Petkovich opined that the claimant had been treated appropriately and successfully and concluded that he was at maximum medical improvement. The doctor further found the claimant able to return to work with permanent restrictions that he may not lift more than 15 to 20 pounds or do repetitive overhead work with his left upper extremity.

Vocational rehabilitation was not offered to the claimant until approximately September 21, 2001. The claimant did, however, initiate an independent job search on April 10, 2001. During the course of his search, the claimant contacted 21 potential employers and received answers of "maybe[ ] and later on." The claimant, who was 51 years old at the time of his job search, had completed the ninth grade and held a GED, and had spent his entire life employed as a mechanic. By the date of the hearing, the claimant testified that he had the "prospect" of starting a job with the telephone company earning $280 a week. During the course of his testimony, "prospect" changed to "a hundred percent" and ended with the claimant stating that he would not secure the job only if, "I die or something." Despite the claimant's faith in his forthcoming employment, he did not have a contract with the telephone company indicating an actual job offer.

Following the hearing, an arbitrator found, *inter alia*, that the claimant sustained an accidental injury on January 17, 2000, arising out of and in the course of his employment at Roper and that a causal relationship exists between the claimant's condition of ill-being and his work-related accident. The arbitrator awarded the claimant PPD benefits representing 50% loss of a man as a whole, and "temporary total disability/maintenance" benefits of $527.04 per week for 87²/₇ weeks, representing the period from January 18, 2000, through September 21, 2001. In addition, the arbitrator ordered Roper to reimburse the claimant $996.28 for the travel expenses that Roper's worker's compensation carrier had agreed to pay in the letter of December 22, 2000.

Roper sought review of the arbitrator's decision before the Commission. The Commission issued a decision, with one commissioner dissenting, in which it adopted the arbitrator's decisions regarding the PPD benefits and travel expenses, but modified the "temporary total disability/maintenance" benefits to provide the claimant: TTD benefits for a period of 54 weeks, representing the period from March 8, 2000, through March 21, 2001; and maintenance for a period of $26^2/7$ weeks, representing the period from March 22, 2001, through September 21, 2001. In awarding the claimant maintenance, the Commission found that the claimant was entitled to a vocational rehabilitation program under section 8(a) of the Act (820 ILCS 305/8(a) (West 2002)) and that his self-created and directed job search took the place of a formal vocational rehabilitation program. The Commission also corrected the arbitrator's finding concerning the claimant's average weekly wage to represent the parties' stipulated amount of $790.49.

The dissenting commissioner argued that maintenance benefits were unwarranted because the law did not place an affirmative burden upon Roper to offer vocational rehabilitation. The dissenting commissioner reasoned that because the claimant failed to request vocational rehabilitation before initiating his self-created job search, he was not entitled to any maintenance costs or expenses incidental to his search.

Roper sought judicial review of the Commission's decision in the circuit court of Gallatin County. The circuit court confirmed the Commission's decision, and Roper initiated the instant appeal.

■ Roper first contends that the claimant waived an award of maintenance by failing to advance a claim for vocational rehabilitation at arbitration. However, the record shows that the claimant, in his request for hearing before the Commission, claimed that he was owed TTD and maintenance benefits for the period between March 9, 2000, and the date of the hearing. We believe that under these circumstances the issue of maintenance cannot be said to be waived.

■ Roper next contends that the Commission erred, as a matter of law, in awarding the claimant maintenance benefits under section 8(a) of the Act for the period between March 22, 2001, and September 21, 2001. Roper argues that a formal request to an employer for vocational rehabilitation is required before maintenance may be awarded and that a self-created and directed job search does not suffice as a program of vocational rehabilitation.

Initially, we note that Roper has failed to cite any legal authority to support this contention in contravention of Supreme Court Rule 341(e)(7). 188 Ill. 2d R. 341(e)(7). Under Rule 341(e)(7), any argument that is not supported by citation to legal authority is deemed waived. 188 Ill. 2d R. 341(e)(7); *Eisenberg v. Industrial Comm'n*, 337 Ill. App.

3d 373, 383 (2003). However, as the doctrine of waiver is a limitation upon the parties and not a restriction upon a reviewing court, we choose to address Roper's contention. See *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 468-69 (2001) (reaching merits of contention despite party's failure to comply with Rule 341(e)(7)).

Under section 8(a) of the Act, an employer "shall *** pay for treatment, instruction and training necessary for the physical, mental and vocational rehabilitation of the employee, including all maintenance costs and expenses incidental thereto." 820 ILCS 305/8(a) (West 2002). Industrial Commission Rule 7110.10(a), entitled "Vocational Rehabilitation," further provides:

> "The employer or his representative, in consultation with the injured employee and, if represented, with his representative, shall prepare a written assessment of the course of medical care, and, if appropriate, rehabilitation required to return the injured worker to employment when it can be reasonably determined that the injured worker will, as a result of the injury, be unable to resume the regular duties in which he was engaged at the time of injury, or when the period of total incapacity for work exceeds 120 continuous days, whichever first occurs." 50 Ill. Adm. Code § 7110.10(a) (2003).

Relying on these enactments, Roper argues that, when read together, section 8(a) and Rule 7110.10(a) place a burden upon the employee to request vocational rehabilitation before maintenance may be awarded. Our reading of section 8(a) and Rule 7110.10(a) fails to reveal this affirmative duty which Roper places upon the claimant.

Section 8(a) requires an employer to pay for an employee's necessary physical, mental and vocational rehabilitation, including the costs and expenses of maintenance. 820 ILCS 305/8(a) (West 2002). Simply read, section 8(a) sets forth the fiscal obligations of an employer under the Act, including an employer's duty to provide maintenance benefits to an employee undergoing vocational rehabilitation. Contrary to Roper's assertion, section 8(a) does not place any burden upon employees to request vocational rehabilitation from their employer before maintenance may be awarded.

Likewise, Rule 7110.10(a) fails to support Roper's argument that the claimant was required to first request vocational rehabilitation before maintenance could be awarded. The rule places no duty on an employee to prepare a written assessment of the course of appropriate rehabilitation. Moreover, when read together, section 8(a) and Rule 7110.10(a) only tend to support a finding contrary to Roper's assertion as neither of the complementary enactments specifies that employees must formally request vocational rehabilitation from their employer

before maintenance may be awarded. Therefore, apart from Roper's failure to support this argument with any legal authority, we find that neither section 8(a) nor Rule 7110.10(a), when read separately or together, support Roper's argument that the claimant was required to request vocational rehabilitation before he was entitled to an award of maintenance. Accordingly, the Commission's award was not incorrect as a matter of law.

■ Roper's next argument, that a self-created and directed job search does not suffice as a program of vocational rehabilitation under the Act, also fails. While Roper is correct that our supreme court has indicated its disapproval of claimant-created, self-directed vocational programs (see *Hunter Corp. v. Industrial Comm'n*, 86 Ill. 2d 489, 499 (1981)), Roper has failed to cite, and our research has failed to uncover, a rule prohibiting claimant-created and directed vocational rehabilitation. In *Hunter* itself, the Commission's vocational rehabilitation and maintenance award was held improper, not because it was claimant-created, but rather because the award was against the manifest weight of the evidence. *Hunter*, 86 Ill. 2d at 498-99; see also *Connell v. Industrial Comm'n*, 170 Ill. App. 3d 49, 55 (1988) (stating that section 8(a) is flexible and does not limit rehabilitation to formal training). Thus, the Commission did not err, as a matter of law, in awarding maintenance for the claimant's self-created and directed rehabilitation program.

Further, we note that the record supports the Commission's award of maintenance in this matter. A claimant is generally entitled to vocational rehabilitation where he sustains a work-related injury which causes a reduction in his earning power and there is evidence that rehabilitation will increase his earning capacity. *National Tea Co. v. Industrial Comm'n*, 97 Ill. 2d 424, 432 (1983). The evidence here shows that the claimant suffered a work-related injury and that the restrictions arising from that injury impaired his earning power. Further, the evidence shows that the claimant's self-created vocational program did in fact increase his earning capacity as demonstrated by the positive results of the claimant's job search. Therefore, the claimant was properly awarded maintenance benefits for the period of time he was undertaking his self-created and directed rehabilitation program.

■ Roper next contends that the Commission's determination that the claimant was entitled to PPD benefits representing 50% loss of a man as a whole is against the manifest weight of the evidence. Again, we disagree.

The extent or permanency of a claimant's disability is a question of fact to be determined by the Commission, and its decision will not

be set aside unless contrary to the manifest weight of the evidence. *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d 828, 833 (2002).

Roper argues that the award of PPD benefits should be reduced from 50% loss of a man as a whole to 40% to 45% loss of the use of the arm because the award is erroneously based on an "earning impairment fiction" created by the claimant. We find Roper's argument unsupported by the record and meritless. First, contrary to Roper's assertion, the Commission did not "rationalize" its PPD award on the claimant's "earning impairment." The Commission's only reference to what Roper characterizes as an "earning impairment" was in the context of the claimant's entitlement to vocational rehabilitation due to his reduction of earning power. Second, based on the evidence presented at the hearing, we cannot say that the Commission's decision to award the claimant PPD benefits representing 50% loss of a man as a whole is against the manifest weight of the evidence. Both Dr. Johnston and Dr. Petkovich placed permanent work restrictions on the claimant prohibiting him from performing repetitive overhead reaching or work with the left upper extremity and from lifting greater than 20 pounds on a repetitive basis with the left upper extremity. The claimant testified that he could not move his left arm higher than 90 degrees or reach behind himself and that simply driving to the arbitration hearing caused him pain. On the basis of this and the remaining evidence presented at the hearing, we cannot conclude that the Commission's award was against the manifest weight of the evidence.

For the foregoing reasons, we affirm the circuit court's order confirming the Commission's decision.

Affirmed.

McCULLOUGH, P.J., and CALLUM, HOLDRIDGE, and GOLDENHERSH, JJ., concur.