# Illinois Official Reports

## Appellate Court

---

### *Euclid Beverage v. Illinois Workers' Compensation Comm'n*,
### 2019 IL App (2d) 180090WC

---

| | |
|---|---|
| Appellate Court Caption | EUCLID BEVERAGE, Appellee, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (John Bohentin, Appellant). |
| District & No. | Second District, Workers' Compensation Commission Division<br>Docket No. 2-18-0090WC |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | November 27, 2018<br><br>February 25, 2019<br>February 25, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 17-MR-1080; the Hon. Paul Fullerton, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Robert W. Burnett, of Burnett & Carson, Ltd., of Naperville, for appellant.<br><br>Robert L. Smith, of Gaido & Fintzen, of Chicago, for appellee. |

Panel                        JUSTICE BARBERIS delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1       The claimant, John Bohentin, appeals the circuit court's order setting aside the Illinois Workers' Compensation Commission's (Commission) decision to award maintenance benefits, finding that the record did not demonstrate that the claimant participated in a vocational rehabilitation program or self-directed job search between April 25, 2012, and June 8, 2015, and confirming the Commission's decision to award permanent partial disability benefits as a percentage of the person as a whole.

¶ 2                          I. Background

¶ 3       At the arbitration hearing on September 28, 2015, the parties stipulated that the claimant had sustained a workplace accident on May 24, 2011, arising out of and in the course of his employment with Euclid Beverage (Euclid) and that he had provided timely notice. The issue before the arbitrator was whether a causal relationship existed between the accident and the claimant's current condition of ill-being. The parties also disputed the claimant's entitlement to benefits.

¶ 4       As a condition of his employment with Euclid, the claimant testified that he underwent a physical examination and functional screening test to demonstrate his ability to lift 50 pounds. He was subsequently hired by Euclid in 1999 as a sales supervisor and held that position until November 2011. In his capacity as sales supervisor, the claimant called various retailers, such as Jewel-Osco, and took orders for beer sales on a handheld device, filled shelves, and built displays to hold anywhere from 10 to 1000 cases of beer. The claimant testified that he performed repetitive lifting of up to 50 pounds, as well as bending, twisting, and reaching throughout the day.

¶ 5       The claimant next testified regarding his previous employment. Prior to Euclid, the claimant worked for Courtesy Distributors for approximately 18 years, first as a delivery driver and then as a delivery manager for four months. As delivery manager, he supervised multiple delivery drivers and ensured proper display and rotation of merchandise. According to the claimant, he was not required to operate a computer; manage inventory or sales; or hire, evaluate, or terminate employees.

¶ 6       The claimant testified that on May 24, 2011, he experienced a sharp pain in his back that radiated down his right leg and "knocked [him] down" while stocking a cooler at a Jewel-Osco location. Following this incident, the claimant contacted Sonia Madalinski, Euclid's human resources director, before a coworker transported him to Tyler Medical Services (TMS).

¶ 7       Shortly thereafter, the claimant presented to TMS and was examined by Dr. George Pappas. After Dr. Pappas documented the claimant's symptoms as "pain radiating into the right leg with tingling," he diagnosed the claimant with a "lumbar sprain with spasms." Dr.

Pappas recommended chiropractic treatment and light-duty work restrictions, which included bending, as tolerated, and lifting no more than 10 pounds.

¶ 8    The claimant testified that he received medical attention for a low back injury prior to the May 24, 2011, accident, although it was asymptomatic prior to the 2011 accident. The claimant's June 2011 MRI of the lumbar region showed a degenerative change in the lumbar spine with disc disease at L2-L3 to L5-S1 and associated lower lumbar ligamentum flavum and facet hypertrophy, which further contributed to central canal and foramina narrowing at L4-L5 and L5-S1. The claimant was referred to a neurosurgeon, Dr. Matthew Ross.

¶ 9    On September 14, 2011, Dr. Ross diagnosed the claimant with lumbar radiculopathy, likely due to disc disease at L5-S1. Dr. Ross recommended nonsurgical treatment with lumbar epidural and transforaminal cortisone injections. Dr. Ross also recommended the claimant avoid lifting over 20 pounds and begin a gradual decrease in work activities.

¶ 10   On September 30, 2011, the claimant presented to Dr. Christopher J. Bergin, an orthopedic surgeon, for a medical evaluation pursuant to section 12 of the Illinois Workers' Compensation Act (Act) (820 ILCS 305/12 (West 2010)) at Euclid's request. Because the claimant's earlier low back injury had been asymptomatic prior to the May 24, 2011, accident, and the mechanism of injury was consistent with aggravation of an underlying degenerative condition, Dr. Bergin concluded that the claimant's condition of ill-being was causally related to the May 24, 2011, accident. Dr. Bergin recommended physical therapy, lumbar epidural injections, and light-duty work restrictions.

¶ 11   On November 22, 2011, Madalinski and Emmett McEnery, Euclid's president, terminated the claimant after informing him that his light-duty work restrictions would no longer be accommodated. The claimant did not seek or gain employment following termination. As such, from November 23, 2011, through April 24, 2012, the claimant received temporary total disability (TTD) benefits. According to the claimant, although he requested, Euclid refused to provide vocational rehabilitation services.

¶ 12   On February 6, 2012, Larry McGrail, Euclid's vice president of operations, invited the claimant to interview for a warehouse manager position. McGrail's letter stated, in part:

> "As you know, the position does not rely on physical ability but rather on the ability to manage people and processes. This Warehouse Manager is responsible for the staff, protecting the integrity of inventory, equipment and the facility and ensuring the trucks get loaded."

Although the claimant received McGrail's letter, he did not interview because he did not feel qualified for the position, given his highest level of education was a high school diploma. Specifically, the claimant believed he lacked the appropriate training and education in warehouse management, inventory control and management, employee scheduling, product shipment, equipment and property management, as well as bills of lading. The claimant used a computer for e-mail and Internet usage, although he described his keyboarding skills as "hunting and pecking," and he lacked training in database programs or Excel spreadsheets.

¶ 13   On February 7, 2012, the claimant presented to Dr. Bergin for a second section 12 evaluation. According to Dr. Bergin's report, the claimant refused epidural injections and declined a surgical procedure. Dr. Bergin diagnosed the claimant with degenerative disc disease of the lumbar spine with a right synovial cyst at L4-L5 and right L5 radiculopathy. Dr. Bergin opined that the claimant's May 24, 2011, accident had aggravated a preexisting

degenerative condition and that he was at maximum medical improvement (MMI) and should undergo a functional capacity evaluation (FCE).

¶ 14    On April 12, 2012, the claimant presented to Dr. James Kelly. Dr. Kelly administered two injections, which, according to the claimant, offered several years of pain relief. Dr. Kelly noted that the claimant had a 50% to 60% improvement in pain but still experienced numbness that was unaffected in his right leg. Specifically, the claimant's pain had improved to a 3 on a 10 scale. Dr. Kelly recommended repeat lumbar epidural cortisone injections, pending authorization, and to follow up with Dr. Ross to increase his work activities.

¶ 15    On April 24, 2012, Dr. Ross released the claimant to work with restrictions to "lift up to 15 lbs. Alternate sit/stand as needed." Following his release to work, Euclid terminated the claimant's TTD benefits on April 24, 2012, after informing him that future employment was unavailable with the above restrictions. The claimant testified that he did not look for work after this date, but he received social security disability (SSD) benefits starting in May 2012.

¶ 16    On January 10, 2014, 20 months after his last medical visit, the claimant presented to Dr. Ross. Dr. Ross noted that the injections administrated by Dr. Kelly provided the claimant with a "lengthy duration of relief," and that Dr. Kelly was in agreement with the claimant's request to complete a FCE. The claimant testified, however, that Euclid never authorized the recommended cortisone injections and the FCE was never scheduled because the insurance company refused to reimburse payment. The claimant testified that his last medical appointment before the arbitration hearing was on January 10, 2014.

¶ 17    On April 27, 2015, the claimant presented to Lisa Helma, certified rehabilitation counselor at Vocamotive Vocational Rehabilitation Services. In preparing an evaluation report, labor market survey, and rehabilitation plan, Helma interviewed the claimant and reviewed his medical and personnel records, McGrail's invitation to interview for warehouse manager, and the Dictionary of Occupational Titles. Helma noted that the warehouse manager position was skilled at the sedentary level of physical demand and that the claimant "does not have previous experience in this capacity. Based upon the results of the Labor Market Survey, [he] would not be a qualified candidate." Helma opined that, although the claimant lost access to his usual and customary line of occupation, he was employable in prior-held positions with the potential to earn $9 and $12 per hour. In forming her opinion, Helma was unaware that the claimant had placed orders with a handheld device while employed with Euclid and that he had previously worked for Courtesy Distributors as a delivery manager where he supervised multiple employees.

¶ 18    McEnery testified to the following. Euclid hired the claimant, a good employee with numerous positive performance appraisals, in 1999. The claimant was required to have a thorough knowledge of essential trade practices because he was responsible for increasing beer sales and distribution, thus, his compensation was tied to his performance. The software used in the claimant's handheld device did not require advanced training, but the claimant had completed mandatory training prior to starting his position as a sales supervisor. According to McEnery, the claimant was a good fit for the warehouse manager position because he had acquired a variety of special skills over 30 years in the industry. In fact, although there were over 150 capable employees, McEnery had recommended the claimant interview for the position.

¶ 19    McGrail testified to the following. McGrail was very familiar with the claimant and his skill set, which included use of Euclid's software system. McGrail invited the claimant to

interview because he believed the claimant was capable of managing and supervising employees, McGrail acknowledged that the claimant did not have experience as an assistant warehouse manager. McGrail also explained that Euclid had terminated the claimant due to his permanent light-duty work restrictions and that he did not offer the claimant a permanent job with work restrictions because the claimant did not interview.

¶ 20    The arbitrator's decision, issued on April 6, 2016, determined that (1) there was a causal connection between the May 24, 2011, work accident and the claimant's current condition of ill-being; (2) the claimant was entitled to TTD benefits of $713.91 per week for 22 weeks from November 23, 2011, through April 24, 2012, with Euclid receiving a credit of $13,360.71 for previously paid TTD benefits; (3) the claimant was entitled to maintenance benefits of $713.91 per week for $162^6/_7$ weeks from April 25, 2012, through June 8, 2015; and (4) the claimant was entitled to permanent partial disability (PPD) benefits, specifically wage differential benefits, for $433.91 per week from June 9, 2015, through the duration of his disability, pursuant to section 8(d)(1) of the Act (820 ILCS 305/8(d)(1) (West 2010)), because his injuries caused an impairment of earnings.

¶ 21    On April 20, 2016, Euclid filed a petition for review before the Commission. On June 27, 2017, the Commission adopted in part and modified in part the arbitrator's decision. The Commission affirmed the arbitrators' award of maintenance and TTD benefits, however, it modified the PPD award from wage differential to a percentage of the person as a whole award, pursuant to section 8(d)(2) of the Act, for $642.52 per week for a period of 200 weeks for 40% loss of man as a whole. The Commission determined that the claimant's "election not to work after being medically cleared to work again prevented him from establishing what he is capable of earning."

¶ 22    On August 7, 2017, Euclid filed for review in the circuit court of Du Page County. On January 9, 2018, the circuit court, without hearing, confirmed in part and set aside in part the Commission's decision. The court confirmed the Commission's decision to award PPD benefits based on a percentage of the person as a whole under section 8(d)(2) of the Act but set aside the Commission's decision to award maintenance benefits, finding that the record did not demonstrate that the claimant participated in a vocational rehabilitation program or self-directed job search between April 25, 2012, and June 8, 2015. On January 31, 2018, the claimant filed a timely notice of appeal.

¶ 23                                                    II. Analysis

¶ 24    This appeal is limited to the propriety of the various types of compensation awarded. In particular, the claimant contends that the Commission's decision to award maintenance benefits was not against the manifest weight of the evidence because Euclid denied the claimant's request for vocational rehabilitation services in violation of section 8(a) of the Act and Illinois Commission Rule 7110.10(a) (50 Ill. Adm. Code 7110.10(a), amended at 30 Ill. Reg. 11743 (eff. June 22, 2006))[1] and he experienced a reduction in earning capacity after Euclid terminated his employment. The claimant also argues that the Commission's percentage of the person as a whole PPD award was against the manifest weight of the evidence.

---

[1]This rule has since been recodified to Commission Rule 9110.10(a) (50 Ill. Adm. Code 9110.10(a) (eff. Nov. 9, 2016)).

¶ 25    In response, Euclid argues that the claimant was not entitled to maintenance benefits because he was not enrolled in a vocational rehabilitation program or engaged in a self-directed job search after April 24, 2012, and he failed to present credible evidence demonstrating a reduction in earning capacity.

¶ 26                                    A. Maintenance Benefits

¶ 27    The claimant argues that Euclid violated section 8(a) of the Act and Commission Rule 7110.10 (50 Ill. Adm. Code 7110.10, amended at 30 Ill. Reg. 11743 (eff. June 22, 2006)) by failing to provide him with vocational rehabilitation services.

¶ 28    "[T]he determination of whether a claimant is entitled to maintenance benefits is a question to be decided by the Commission, and its finding will not be reversed unless it is against the manifest weight of the evidence." *W.B. Olson, Inc. v. Illinois Workers' Compensation Comm'n*, 2012 IL App (1st) 113129WC, ¶ 39. For a finding of fact to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent from the record on appeal. *City of Springfield v. Illinois Workers' Compensation Comm'n*, 388 Ill. App. 3d 297, 315 (2009).

¶ 29    Under section 8(a) of the Act (820 ILCS 305/8(a) (West 2010)), an employer "shall *** pay for treatment, instruction and training necessary for the physical, mental and vocational rehabilitation of the employee, including all maintenance costs and expenses incidental thereto." Since maintenance is awarded incidental to vocational rehabilitation, an employer is obligated to pay maintenance only "while a claimant is engaged in a prescribed vocational-rehabilitation program." *W.B. Olson, Inc.*, 2012 IL App (1st) 113129WC, ¶ 39. "A claimant is generally entitled to vocational rehabilitation when he sustains a work-related injury which causes a reduction in his earning power and there is evidence that rehabilitation will increase his earning capacity." *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1019 (2005). Because the primary goal of rehabilitation is to return the injured employee to work (*Schoon v. Industrial Comm'n*, 259 Ill. App. 3d 587, 594 (1994)), if the injured employee has sufficient skills to obtain employment without further training or education, that factor weighs against an award of vocational rehabilitation. *National Tea Co. v. Industrial Comm'n*, 97 Ill. 2d 424, 432 (1983). Moreover, an injured employee is generally not entitled to vocational rehabilitation if the evidence shows that he does not intend to return to work, although able to do so. *Schoon*, 259 Ill. App. 3d at 594.

¶ 30    Vocational rehabilitation may include, but is not limited to, counseling for job searches, supervising job search programs, and vocational retraining, which includes education at an accredited learning institution. See 820 ILCS 305/8(a) (West 2010). An employee's self-directed job search or vocational training may constitute a vocational-rehabilitative program. *Roper Contracting v. Industrial Comm'n*, 349 Ill. App. 3d 500, 506 (2004). Additionally, "rehabilitation efforts may be undertaken even though the extent of the permanent disability cannot yet be determined." *Freeman United Coal Mining Co. v. Industrial Comm'n*, 318 Ill. App. 3d 170, 180 (2000).

¶ 31    Commission Rule 7110.10(a) provided as follows:

    "The employer or his representative, in consultation with the injured employee and, if represented, with his or her representative, shall prepare a written assessment of the course of medical care, and, *if appropriate*, rehabilitation required to return the injured worker to employment when it can be reasonably determined that the injured worker

will, as a result of the injury, be unable to resume the regular duties in which engaged at the time of injury, or when the period of total incapacity for work exceeds 120 continuous days, whichever first occurs." (Emphasis added.) 50 Ill. Adm. Code 7110.10(a), amended at 30 Ill. Reg. 11743 (eff. June 22, 2006).

Thus, the rule required the employer to provide rehabilitation only if "appropriate." (50 Ill. Adm. Code 7110.10(a), amended at 30 Ill. Reg. 11743 (eff. June 22, 2006)). As noted above, rehabilitation is neither mandatory for the employer nor appropriate if an injured employee does not intend, although capable, to return to work. *Schoon*, 259 Ill. App. 3d at 594.

¶ 32 We are unpersuaded by the claimant's arguments. First, the claimant never sought or gained employment following termination from Euclid on November 22, 2011. As such, rehabilitation would be neither mandatory nor appropriate because the claimant did not show an intention to return to work, although he was capable, as evidenced by Dr. Ross's notes releasing the claimant to work with work restrictions on April 24, 2012, to "lift up to 15 lbs. Alternate sit/stand as needed." Moreover, it is undisputed that the claimant did not enroll in a vocational rehabilitation program or engage in a self-directed job search after Euclid terminated his TTD benefits on April 24, 2012. In fact, the Commission concluded that the claimant abandoned the job market on that date. On that basis, contrary to the Commission's decision, Euclid's obligation to provide maintenance was never triggered, and the claimant failed to cite authority to support that notion.

¶ 33 Even assuming the claimant was entitled to rehabilitative services, he could have requested an expedited hearing under section 19(b) of the Act (820 ILCS 305/19(b) (West 2010) ("the employee may at any time petition for an expedited hearing by an Arbitrator on the issue of whether or not he or she is entitled to receive payment of the services or compensation")). The claimant failed to request such a hearing.

¶ 34 Furthermore, we cannot find that the claimant proved a reduction in his earning capacity after he was terminated from Euclid. First, the Commission found that he had failed to prove his earning capacity because his reliance on Helma's labor survey was "unacceptable speculation." In rejecting Helma's opinions, the Commission concluded that Helma's report was completed in anticipation of litigation, just four months prior to the arbitration hearing, and that Helma lacked knowledge regarding the claimant's previous employment managing employees as a delivery manager, which would have likely broadened the scope of possible employment opportunities. Thus, the Commission concluded that the claimant was prevented from establishing "what he is capable of earning." In light of the foregoing, we find that the Commission's decision, awarding the claimant maintenance benefits from April 25, 2012, to September 28, 2015, was against the manifest weight of the evidence. Accordingly, the circuit court's decision setting aside the Commission decision to award maintenance benefits is affirmed.

¶ 35                                                    B. PPD Award

¶ 36 There are two distinct types of PPD awards under section 8(d) of the Act. *Gallianetti v. Industrial Comm'n*, 315 Ill. App. 3d 721, 727 (2000). Section 8(d)(1) of the Act provides for a wage differential benefit (820 ILCS 305/8(d)(1) (West 2010)), and section 8(d)(2) of the Act provides for a percentage of the person as a whole award (820 ILCS 305/8(d)(2) (West 2010)).

¶ 37 To qualify for wage differential benefits, a claimant must prove (1) a partial incapacity that prevents claimant from pursuing his usual and customary line of employment and (2) an

impairment of earnings. 820 ILCS 305/8(d)(1) (West 2010). The purpose of a wage differential award is to compensate an injured claimant for his reduced earning capacity. *Jackson Park Hospital v. Illinois Workers' Compensation Comm'n*, 2016 IL App (1st) 142431WC, ¶ 39. The amount of a wage differential benefit is

> "equal to 66²/₃% of the difference between the average amount which [the claimant] would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of the accident and the average amount which he is earning or is able to earn in some suitable employment or business after the accident." 820 ILCS 305/8(d)(1) (West 2010).

¶ 38    Conversely, section 8(d)(2) of the Act provides for a PPD award based on a percentage of the person as a whole. 820 ILCS 305/8(d)(2) (West 2010). A percentage of the person as a whole award is appropriate in three circumstances: (1) when a claimant's injuries do not prevent him from pursuing the duties of his employment but he is disabled from pursuing other occupations or is otherwise physically impaired, (2) when a claimant's injuries partially incapacitate him from pursuing the duties of his usual and customary line of employment but do not result in an impairment of earning capacity, or (3) when a claimant, having suffered an impairment of earning capacity, elects to waive his right to recover. 820 ILCS 305/8(d)(2) (West 2010).

¶ 39    Our supreme court has expressed a preference for wage differential benefits over a scheduled award, noting "the basis of the workers' compensation system should be earnings loss." *General Electric Co. v. Industrial Comm'n*, 89 Ill. 2d 432, 438 (1982). Thus, where a claimant proves he is entitled to wage differential benefits, the Commission is without discretion to impose a section 8(d)(2) award except where a claimant waives his right to recover under section 8(d)(1). See *Gallianetti*, 315 Ill. App. 3d at 729. The issue of whether a claimant is entitled to a wage differential award is generally a question of fact for the Commission to determine. *Dawson v. Illinois Workers' Compensation Comm'n*, 382 Ill. App. 3d 581, 586 (2008). We review the Commission's factual findings under the manifest-weight-of-the-evidence standard. *Tower Automotive v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 427, 434 (2011).

¶ 40    In reversing the arbitrator's wage differential award, the Commission determined that a percentage of the person as a whole award was more appropriate because the claimant had failed to establish entitlement to a wage differential award. In particular, the Commission determined that, although the claimant was unable to return to Euclid as a sales supervisor, a finding uncontested on appeal, the claimant did not establish an impairment of earnings. Therefore, the crucial issue in determining whether the claimant was entitled to a wage differential award is whether he proved that he suffered impairment in his "earning capacity." *Jackson Park Hospital*, 2016 IL App (1st) 142431WC, ¶ 42. If the claimant proved a loss in his earning capacity, then the Commission's PPD award, based on a percentage of the person as a whole, was against the manifest weight of the evidence. *Gallianetti*, 315 Ill. App. 3d at 728 ("the plain language of section 8(d) prohibits the Commission from awarding a percentage-of-the-person-as-a-whole award where the claimant has presented sufficient evidence to show a loss of earning capacity").

¶ 41    The Commission found that the claimant had abandoned the job market on April 24, 2012, and failed to prove his earnings capability. Specifically, the Commission stated that the claimant's reliance on Helma's labor survey to establish his earnings potential was

"unacceptable speculation." In particular, the Commission noted that Helma's reports were completed in anticipation of litigation, just four months prior the arbitration hearing, and she lacked an understanding regarding the claimant's previous work managing multiple employees, which could have broadened the scope of possible employment opportunities. Thus, the Commission concluded that the claimant was prevented from establishing "what he is capable of earning."

¶ 42    Based on the foregoing, we cannot say that the opposite conclusion is clearly apparent regarding the Commission's determination to award a percentage of the person as a whole benefits rather than wage differential benefits. Accordingly, the decision of the circuit court, confirming the Commission's decision to award PPD benefits based on a percentage of the person as a whole, is affirmed.

¶ 43                                   III. Conclusion
¶ 44    We affirm the circuit court's order setting aside in part and confirming in part the Commission's decision.

¶ 45    Affirmed.